Garbutt and others vs. The Bank of Prairie du Chien.

GARBUTT and others vs. THE BANK OF PRAIRIE DU CHIEN.

*Fraudulent Sale: Evidence.—Conditional Sale.—Reversal of judgment, in cause tried without a jury.*

1. In case of a merchant purchashing goods, the mere fact of his insolvency which he omits to disclose, does not render the purchase fraudulent.

Garbutt and others vs. The Bank of Prairie du Chien.

2. The evidence in this case *held* insufficient to establish fraud in a sale of goods.

3. A. bought goods, certain of which were to be paid for on delivery, and his notes sent for the remainder. At a point in their transit, he detained them, and sold them to B. (who knew the terms of the purchase), sending his notes as agreed, and another note instead of the cash payment. *Held,* that as to the goods which were to be paid for on delivery, the sale to A. was conditional, and the goods might be reclaimed by the original owners as against B.

4. On reversing a judgment in a cause tried without a jury (under the statute), this court will generally not order a *venire de novo,* but direct the court below to enter the proper judgment.

APPEAL from the Circuit Court for *Crawford* County.

Replevin. The plaintiffs obtained possession of the property (consisting of groceries), and sold it pending the action. The goods were originally sold by plaintiffs to one Dayton, through their traveling agent, one Platt, who testified for them substantially as follows: " I took the order for the goods in February, 1865, at Dayton's store, in Ossian, Iowa. The teas and certain other goods were to be paid for in four months; raw sugars and certain other goods in sixty days; the balance were to be cash; the invoices show particularly. Notes were to be given for the deferred payments. The invoices and the bill of lading of their shipment from New York to Prairie du Chien were to be sent to Dayton by mail. After I had received the order for the goods from Dayton, I saw it was a considerable amount, and I thought I would ask him how matters stood. I did not wish to be impertinent. I said to him, ' you seem to have a good place here for business;' he replied that he had; that he had not yet been there a year; that he had sold at the rate of $18,000 in four months, and had got his pay for them. He carried the idea that he was doing a cash business; that was all he said. We shipped the goods in accordance with our agreement; sent the invoices and

bill of lading in the same envelope to Dayton, by mail, about 13th March. It takes a letter about a week to go from New York to Ossian. Dayton did not send the money according to agreement; sent a note at forty days instead (along with the two notes agreed upon), in a letter." The notes and letter were put in evidence. The letter was dated " Ossian, April 3d," and was as follows: " I enclose three notes, the amount of your account. I have taken the liberty because the great decline in all goods, and consequent dullness of trade, makes it necessary that I have this time in which to pay for them. I have not seen the goods yet; I suppose they are on the way. I hope you will be satisfied."

This letter was not received by the plaintiffs until April 20th; and on the same day they received notice by telegraph (the printed case does not show from where or from whom), stating that Dayton had failed and sold out fraudulently to one Comstock. Platt further testified: " I came to Prairie du Chien, getting here April 25th; found the goods in defendant's possession, and replevied them the same day; Ray, cashier of defendant, was present when they were replevied; he had invoices of the goods there at the time; and said that when he purchased them he noticed that some were bought for cash, and spoke to Dayton about it, who said he would take the necessary amount ($500) out of the $1,500, to pay the cash bill." On cross-examination, the witness said: " Ray told me there were other goods bought at the same time, altogether amounting to about $3,000; that he paid $1,000 to Dayton; and that the balance was credited to Comstock's account. Ossian is in Iowa, about forty or fifty miles from Prairie du Chien. I went there, and to Dayton's store, and solicited the order from him." William Dutcher, for the plaintiffs, testified: " I was present when these goods were separated from others, at the time they were replevied. Mr. Ray said he

purchased the goods of Dayton, and paid him $1,500 cash, and gave credit to Comstock for $1,500 on a debt which Comstock owed the bank, and which he did not consider very good; the trade was made because he wished to get pay on Comstock's debt." Ray, the cashier, testified for defendant: " In the spring of 1865, Comstock was indebted to defendant; told me could get assistance through a relative of his, if I would take some goods; we had conversations about the matter three or four times. Before the bargain was concluded, he produced sundry invoices of goods, amounting to about $3,000, and it was finally agreed that he should let me have $3,000 worth of goods at cost, freight added. He said that he, or the party of whom he was to have the goods, needed about $1,500 in cash, and that defendant could have the benefit of the other $1,500, by giving him (Comstock) credit to that amount on his indebtedness to defendant. I wanted to apply more of the purchase price of the goods on Comstock's debt, but he said the friend he got the goods of had to have at least that much money. Comstock and I had had several talks about this arrangement, for perhaps a week before it was consummated. The arrangement was simply that the goods were to be delivered to to us, and we to pay $1,500 in money, and give credit to Comstock for $1,500 more. The bargain was concluded on the 12th of April; Comstock left on the 12th or 13th, I can't be positive which, and left instructions that I should pay this $1,500 to G. S. Dayton, who came to town with him on the 12th; that Dayton would see to the delivery of the property. In pursuance of these instructions, I paid the $1,500 to G. S. Dayton, gave Comstock credit for the other $1,500, and the goods were handed over to us, April 13th, and put in our own building. Comstock said that Dayton was willing and able to help him. At the time of the sale, Comstock delivered to me these three invoices of

the goods, and this bill of lading." The invoices and bill of lading were put in evidence. The first invoice contained at the head, just before the enumeration of articles, the words "Terms Cash;" the second the words "Terms 60 days;" the third "Terms 4 months." The bill of lading was to Prairie du Chien; showed that the goods were directed to Dayton at Ossian, and was otherwise in the usual form of receipts for goods to be forwarded by the "Merchants' Despatch." Ray further testified: "I never saw these invoices till April 12, when the final agreement was concluded. Comstock delivered the goods after I paid the money. * * I don't suppose I ever told any person in my life that I bought these goods of any one but Comstock; it would be contrary to the facts of the case if I did. The purchase was in the most perfect good faith: I paid a full consideration for them."

Plaintiffs, being permitted to introduce evidence of Dayton's insolvency at the time of his purchase, called Comstock, who testified: "Dayton was in trade at Ossian just prior to selling these goods to the bank; his store was open at the time of the sale; he went out of business about ten days after; he stopped business because his stock of goods was attached by Hughes, of Milwaukee, and another creditor; all I know about the attachment is from hearsay. He remained in Ossian a few days after, and then went to see his sick father; was East one month; the goods being attached, and his father's illness, broke up his business. He had a large amount of goods on hand; had an inventory of his circumstances which I saw; his debts were from nine to ten thousand dollars, effects from twelve to fifteen thousand. He has been a traveling commercial agent ever since; his debts were not all paid nine months ago. He was not insolvent at the time of the purchase of the goods from plaintiffs; his paper had always been paid."

The court held the defendant entitled to recover the value of all the goods, with interest. Judgment accordingly, from which plaintiffs appealed.

*E. Mariner* and *David S. Ordway*, for appellants, contended from the evidence that Dayton ordered the goods knowing himself to be insolvent, and concealing that fact; and that this was evidence of a design not to pay for them. To the point that fraud may be inferred from circumstances of this character, they cited *Hennequin v. Naylor*, 24 N. Y., 141; *Nichols v. Michael*, 23 id., 265, (and 18 id., 305); *Brown v. Montgomery*, 20 id., 287. If a purchaser of chattels from a fraudulent buyer has notice of circumstances which would naturally excite the suspicions of a man of ordinary caution, and forbears to make inquiry, he does not acquire title as against the vendor. *Pringle v. Phillips*, 5 Sandf., 157, 173; *Danforth v. Dart*, 4 Duer, 101; 1 Story's Eq. Jur., §§ 399, 400; *Williamson v. Brown*, 15 N. Y., 354; 4 Sandf., 566. 2. The sale was conditional; the purchase was entire; and if the condition was not performed as to the cash goods, it was voidable *in toto*. 1 Cow. Tr. (3d ed.), 124; *Palmer v. Hand*, 13 Johns., 435; *Haggarty v. Palmer*, 6 Johns. Ch., 437; *Morris v. Rexford*, 18 N. Y., 555; *Levin v. Smith*, 1 Denio, 571, and cases there cited; *Corlies v. Gardner*, 2 Hall, 346; *Smith v. Dennie*, 6 Pick., 265; *Dows v. Dennistoun*, 28 Barb., 393; Opinion of Senator ALLEN in *Furniss v. Hone*, 8 Wend., 260 et seq.; *Beavers v. Lane*, 6 Duer, 242; *Van Neste v. Conover*, 20 Barb., 547. As to plaintiffs' right, on receipt of Dayton's letter, to rescind the contract, as against him, and also as against defendant if chargeable with notice, counsel further cited 1 Sprague, 473; *McEachron v. Randles*, 34 Barb., 301; and to the point that defendant had constructive notice of plaintiffs' rights, they cited *Hill v. Epley*, 31 Pa. St., 331; *Decan v. Shipper*, 35 id., 239; *Williamson v. Brown*, 15 N. Y., 354; *Dunham v. Dey*, 15 Johns., 568–9;

*Le Neve v. Le Neve*, 1 L. C. in Eq., 110–11, 116; Story's Eq. Jur., §§ 399, 400; *Pringle v. Phillips*, 5 Sandf., 171–3; *Barnes v. McClinton*, 3 Penn., 67; *Doyle v. Teas*, 4 Scam., 202; *Jones v. Smith*, 1 Hare, 55.

*O. B. Thomas* (with whom was *S. U. Pinney*, of counsel), for respondent, argued, among other things, that the delivery to Dayton of a clear bill of lading, with nothing to restrict its assignability, or to prevent him from using it as evidence of absolute ownership, justified Ray in believing that the delivery of the goods was absolute (*Buffington v. Curtis*, 15 Mass., *528; *Walter v. Ross*, 2 Wash. C. C., 283; Hilliard on. Sales, 103; Story on Sales, § 347, and case cited in note 2; *Stanton v. Eager*, 16 Pick., 473); and to the point that such absolute delivery, in case of a conditional sale, is a waiver of the condition, he cited *Ives v. Humphreys*, 1 E. D. Smith, 196; *Smith v. Lynes*, 1 Seld., 44, and cases there cited; *Lupin v. Marie*, 6 Wend., 81; *Furniss v. Hone*, 8 id., 77; *Hussey v. Thornton*, 4 Mass., 405; *Chapman v. Lathrop*, 6 Cow., 110; 1 Edw. Ch., 140. In any event, the right to reclaim, on the ground that the sale was conditional, could extend only to the bill sold for cash.

CoLE, J. The evidence in this case will hardly warrant us in saying that the sale of the goods by the plaintiffs to Dayton should be avoided on account of fraud. It does not appear that Dayton made any fraudulent representations in regard to his business, or resorted to any artifice to deceive the vendors in respect to his pecuniary responsibility. The witness Platt, who was a traveling agent for the plaintiffs in Iowa and Wisconsin, testifies that he went to Dayton's store at Ossian, and solicited the order from him. He says: " After I had received the order for the goods from Dayton, I saw it was a considerable amount, and I thought I would ask him how matters stood. · I did not wish to be impertin-

ent; I said to him, 'You seem to have a good place here for business;' he replied that he had; that he had not yet been there a year; that he had sold at the rate of $18,000 in four months, and had got his pay for them; he carried the idea that he was doing a cash business; *that was all he said.*" There is nothing in the evidence to show that these statements of Dayton in respect to his business were untrue; and it seems that Platt was satisfied with them, and made the order. But it is claimed that the proofs show that Dayton purchased the goods with a fraudulent design, and with the intent to cheat the plaintiffs out of their value. Such an act, it is said, is sufficient to avoid the sale, and gives the defrauded party the right to reclaim the property either from Dayton or from any person purchasing from him with actual or constructive notice of the fraud. The facts relied upon chiefly to show the fraudulent design are: First, that Dayton was insolvent when he made the purchase, and must have known that this was his pecuniary condition. But how is the fact of insolvency established? The only witness sworn upon this point was Comstock, who testifies that Dayton was not insolvent at the time of the purchase of the goods from the plaintiffs; that his paper had always been paid; that he was owing, when his stock was attached, from nine to ten thousand dollars, and his effects inventoried from twelve to fifteen thousand. This evidence does not show a very desperate state of affairs, but quite as good probably as many country merchants could exhibit. At all events, we would not be authorized in assuming, in view of this statement as to Dayton's pecuniary condition, that he was insolvent when he bought the goods of the plaintiffs. It is true, it is insisted that the statement of this witness as to Dayton's circumstances and responsibility should be regarded with suspicion, because he was a relative of Dayton, and was confederating with him in the attempt to defraud.

But he was the plaintiffs' own witness—a hostile one perhaps—and we are not at liberty to discredit entirely his statements. Besides, it does not appear that Platt made any inquiries of Dayton as to his means and ability to pay, but went to his store and *solicited* the order. Upon the authorities cited by counsel on both sides, even if Dayton were insolvent at this time and knew it, the mere fact that he omitted to disclose his insolvency would not of itself constitute a fraud for which the sale would be avoided. *Nichols v. Pinner*, 18 N. Y., 295; *Hall v. Naylor*, id., 588; *Nichols v. Michael*, 23 id., 264; *Hennequin v. Naylor*, 24 id., 139. But the omission to disclose his insolvency at the time of the purchase must be accompanied with some dishonest purpose on the part of the vendee, in order to destroy the contract. So that, according to the doctrine of the above cases, even if it had been clearly shown that Dayton was insolvent when he made the purchase—as it has not been—this fact alone, unconnected with other suspicious circumstances, would not be sufficient evidence of a fraudulent design not to pay for the goods.

But it is said, in the next place, that the circumstances attending the sale by Dayton to Comstock, or to the bank, were such as to authorize the inference that the purchase was made of the plaintiffs with the design to defraud. It appears that the salesman, Platt, took the order for these goods some time in February. They were sent by the Merchants' Despatch to Prairie du Chien, marked "G. S. Dayton, Ossian, Iowa." About half of the goods arrived at Prairie du Chien on the 26th of March following; the remainder on the 4th of April. The invoices and bill of lading were sent to Dayton. He took possession of the goods at Prairie du Chien, and, on the 12th of April, either himself sold them in the original packages to the bank, or sold them to Comstock, who made that sale. The bank insists that it

bought the goods of Comstock, who was indebted to it in a considerable amount, and who had proposed selling the bank goods to the amount and value of $3,000, on condition that the bank would pay him $1,500 in cash, the balance to be credited on his indebtedness. And it has attempted to show by its cashier, who transacted the business, that the bank acceded to this proposal on the 12th of April, and that on the following day it paid $1,500 to Dayton, at Comstock's request, and credited Comstock's account with a like amount, and took possession of the goods. We do not deem it material to the inquiry of fraudulent intent on the part of Dayton when he purchased the goods of the plaintiffs, whether he sold them to the bank or to Comstock. The question is, were the circumstances attending this sale such as to indicate a purpose not to pay for the goods when he gave the order; or is it consistent with the supposition that he then intended to perform his contract? It seems to us that it is perfectly consistent with the latter supposition. It is an admitted principle, that fraud must be proven and cannot be inferred upon doubtful evidence. Now it is said that these goods were sold by Dayton, while in transit in the original packages, to help a relative embarrassed and in debt, and that these circumstances are strong badges of fraud. To this it is answered that Dayton was induced to make this sale in the time and manner he did, solely by the pressure of events which occurred after he gave the order. It appears that a few days after the sale to the bank, the store of Dayton in Ossian was taken possession of by attaching creditors; and it is said, Dayton was probably threatened with these attachments, and that hence it is natural to conclude he made this sale as he did rather than take the goods to their destination and mingle them with his stock about to be attached. If this explanation of Dayton's conduct is not entirely satisfactory, it may nevertheless be correct. It is

doubtless the way a timid and inconsiderate debtor frequently acts when strongly pressed by an importunate creditor. At all events, from so equivocal a transaction we do not feel authorized to say that Dayton must have purchased the goods originally with a fraudulent purpose.

The other circumstances relied on to show fraud in the purchase, throw little or no light on the question as to when the fraudulent design was formed. Upon the other points, whether the sale was a conditional one and voidable because the condition was not performed, we have come to this conclusion upon the evidence. We think the sale of each bill of goods must be treated as a transaction separate and distinct from the others. Goods of one description were to be paid for on delivery; those of another description were to be paid for by note at sixty days; while those of a third description were to be paid for by a note at four months. Dayton sent forward his notes for the goods purchased on credit, according to the conditions of those sales. But instead of making immediate payment for the cash bill, he sent on his note payable in forty days. He certainly had no right to vary thus the terms of sale for this bill of goods. And, as the delivery of those goods was made upon condition that he pay for them in cash, and he has failed to do this, the plaintiffs may reclaim that bill of goods. The soundness of this principle is not contested by the counsel for the bank, but it is said the agent of the bank had no notice that the delivery of this bill of goods was conditional. This is a mistake. The evidence shows most clearly and positively that the agent, Ray, had notice of this condition, and that it had not been waived at and before the time the sale was made to the bank.

By the judgment of this court, as already announced, it was ordered that the judgment of the circuit court be reversed, and that a *venire de novo* be awarded. A motion

has been made to correct this judgment, and that the *remittitur* contain a direction to the circuit court to give judgment for the plaintiffs for the value of the cash bill of goods, and for the defendant for the residue. The cause was tried by the court, and therefore this court has to review questions of law and fact, when proper exceptions have been taken. And when the court does this under sec. 16, chap. 264, Laws of 1860, it is said, in the event the judgment is reversed, that the cause should be sent down with directions for the court below to enter such a judgment as upon the evidence this court thinks should be rendered, and not for a new trial. This, doubtless, is a correct view of the practice under this provision of law. For it can hardly be supposed the legislature would impose upon this court the labor of reviewing questions of fact in common law cases, and, where error has intervened, merely send the cause back for a new trial. The legislature must have intended that the practice in this class of cases should be similar to that in the trial of equity causes. In equity causes this court reviews the evidence, and, in case it reverses the judgment, sends the cause down to the court below with directions to enter the proper judgment. This is the usual practice, a new trial not being ordered except under special circumstances. And we are satisfied that the same practice should prevail in common law actions, where the cause is tried by the court or before a referee, and comes to this court for a review upon questions of fact. There possibly might be cases where a new trial should be awarded; but ordinarily the cause should be sent down with directions for the court below to enter such a judgment as this court may think, upon the record, should be given. And this, we think, has been our usual practice under this statute. *Snyder v. Wright*, 13 Wis., 689; *Fisher et al. v. The Farmers' Loan & Trust Company*, 21 id., 73.

The remittitur, therefore, should not be for a new trial, but contain the direction mentioned in the motion.

*By the Court.*—Ordered accordingly.

On a motion for a rehearing, plaintiffs' counsel argued that there was but one order for the goods, and the contract of sale was not separable. Dayton could not have retained the goods which were to be paid for in cash, while refusing to receive the remainder; nor could the plaintiffs, if they had delivered only those, have recovered therefor without having delivered or offered to deliver the remainder. 2 Parsons on Con. (5th ed.), 517 ; *Baker v. Higgins*, 21 N. Y., 398; *Clark v. Baker*, 5 Met., 452 ; *Tipton v. Fietner*, 20 N. Y., 423; *Goodwin v. Merrill*, 13 Wis., 659; *Bendernagle v. Cocks*, 19 Wend., 215.

The motion was denied.—REP.