## JOSEPH KLOPENSTEIN *et al.*, APPELLANTS, *v.* PATRICK MULCAHY, RESPONDENT.

MERE INSOLVENCY OF PURCHASER OF GOODS DOES NOT AVOID SALE. The mere insolvency of the purchaser of goods on credit, although well known to himself, if no false representations are made and no artifice used, will not avoid a sale to him.

WHAT FALSE REPRESENTATIONS WILL AVOID SALE OF GOODS. Any false representations or artifice by a purchaser of goods, if the seller is thereby induced to part with them, which otherwise he would not have done, will invalidate the sale, whether the purchaser is solvent or insolvent.

WHAT FALSE REPRESENTATIONS WILL NOT AVOID SALE. False representations by a purchaser of goods will not avoid the sale, unless it appears that the seller was thereby induced to do that which he would probably not have done but for them.

PURCHASE OF GOODS WITH INTENTION NOT TO PAY. A sale of goods on credit will be avoided when the buyer, knowing himself insolvent, purchases with the intention of not paying for them, although no false representations are made by him.

APPEAL from the District Court of the First Judicial District, Storey County.

This was an action of replevin brought by Joseph Klopenstein and Andrew Klopenstein, partners, doing business in San Francisco, under the firm name of Klopenstein & Co., against the Sheriff of Storey County, to recover certain groceries, alleged to be of the value of five thousand dollars or thereabouts, sold by them to Numa Grange, of Virginia City. The defendant in his answer, among other defenses, set up a justification as Sheriff under writs of attachment and execution on two certain suits commenced by the firm of C. A. Peake & Co., of Sacramento, against Grange, in which the goods were duly attached, and after judgment levied on as the goods of said Grange, to whom he alleged they then belonged. Under the replevin writ the goods were taken out of the possession of the Sheriff, who in his answer claimed a return thereof, or their value, in the sum of six thousand seven hundred dollars.

The judgment was in favor of the defendant for a return of the goods, or for four thousand eight hundred and seventy-six dollars, the adjudged value thereof, in case a return of them could not be had.

The other facts are stated in the opinion.

*Hillyer and Whitman,* for Appellants.

*Williams and Bixler,* for Respondent.

Counsel on the respective sides discussed the case, principally upon the testimony, at great length, the appellants citing the case of *Seligman* v. *Kalkman,* 8 Cal. 207, as laying down the correct rule of law upon the main point involved ; and the respondent insisting upon the law as laid down in *Bell* v. *Ellis,* 33 Cal.

Appellants also cited *Coghill* v. *Burney,* 15 Cal. 213 ; *Thompson* v. *Rose,* 16 Conn. 71 ; *Gardner* v. *Preston,* 2 Day, 202 ; *Cary* v.

20

*Hotaling,* 1 Hill, 311 ; *Olmsted* v. *Hotaling,* 1 Hill, 317 ; *Ford*
v. *Atwater,* 1 Root, 59 ; *Brown* v.. *Montgomery,* 20 N. Y. 287 ;
*Buffington* v. *French,* 15 Mass. 157 ; *Van Nest* v. *Conover,* 20
Barb. 547, and *Nichols* v. *Michael,* 23 N. Y. 264.

Respondents cited, in addition to *Bell* v. *Ellis,* the cases of
*Henshaw* v. *Bryant,* 4 Scam. 97 ; *Nichols* v. *Pinner,* 18 N. J.
295 ; *Biggs* v. *Barry,* 2 Curtis C. C. 259 ; *Bidualt* v. *Wales,* 19
Miss. 36, Ib. 546 ; *Addington* v. *Allen,* 11 Wend. 374 ; *Wells*
v. *Jewett,* 11 How. Pr. R. 242 ; *Backentoss* v. *Speicher,* 31 Penn.
325, and 2 Parsons on Contracts, 269, and note *u* on page 270.

By the Court, LEWIS, J.

Some time during the summer of 1866, one Numa Grange, who
was then engaged in the mercantile trade in Virginia City, began
to purchase goods of the plaintiffs, who were in the · same trade in
the city of San Francisco, under these circumstances : Being in-
troduced to the plaintiff Joseph Klopenstein, by a mutual acquaint-
ance, Grange stated that he wished to purchase a small bill of goods
upon a credit of forty-five days. Before selling the goods Klopen-
stein made some inquiries of Grange as to his financial condition,
and his standing with the merchants with whom he had formerly
traded. The conversation which then took place upon that subject
is thus related by Klopenstein in his testimony : " I asked him how
he was situated pecuniarily, and with whom he had been trading
before. He said he had been trading with Booth & Co. and Peake
& Co. of Sacramento City. I asked him how he stood with Booth
& Co. ; he said he owed them a few thousand dollars. I asked
him how much he owed Peake & Co. ; he said a little less than
four thousand dollars. He said he had a good business, which he
hoped to increase, and a stock of goods on hand which would be
filled by the assortment he proposed to take from me."

This is all of the conversation, as related by plaintiff Klopen-
stein, which took place between him and Grange. The witness
concludes by saying : " On these representations I sold him the
bill of goods in September."

Grange, who after his failure was employed by the plaintiffs, re-
lates this conversation in this wise : " I talked with Mr. Klopen-

stein, who asked me in what situation I stood.    I told him I owed a little balance to the house of Booth & Co., and I think I mentioned the house of Peake & Co. of Sacramento.    I told him I had been dealing largely in Sacramento.    I am not certain that I mentioned the amount I owed.    Klopenstein asked me if it was a couple of thousand dollars.    I told him yes, about that; I did not answer him more definitely than that."

It appears that at the time of this conversation Grange's indebtedness to Booth & Co. was something over five thousand dollars, and to Peake & Co. about forty-three hundred dollars.    The goods sold by the plaintiffs at this time amounted to about eleven hundred dollars.    Purchases were afterwards made at various times up to the first day of December, A. D. 1866, all of which were upon a credit of forty-five days.    The goods purchased in September were paid for at the expiration of the time of credit, and one thousand dollars was also paid on the purchases made afterwards.

In the month of February Grange's stock of goods was attached by Peake & Co., upon the debt due them; taken by Mulcahy, the Sheriff, upon the writ, and held by him at the time this action was brought.

The plaintiffs now seek to recover the goods which were not paid for, upon the assumption that all the sales were rendered void by the fraudulent misrepresentations made by Grange as to the amount of his indebtedness, and subsequent misstatements made by letter at various times during the period in which the goods sought to be recovered were sold.

Upon a fair submission of the case to the jury a verdict was rendered against the plaintiffs, who now appeal from the judgment and the order refusing a new trial.

Upon these facts the material questions to be passed upon by this Court are: First—Did the mere fact of Grange's insolvency (he knowing it) at the time he purchased the goods of the plaintiffs invalidate the sales?    If not, then, Second—Were Grange's representations of his pecuniary condition or state of business such as to produce the result?

That the mere insolvency of the vendee, although well known to himself, will not avoid a sale, is a proposition so strongly fortified

by the authorities that no Court would now be justified in over-turning it. *Seligman* v. *Kalkman* (8 Cal. 207) is perhaps the only case that can be found in the books announcing a contrary doctrine. It must be admitted that in that case the Supreme Court of California, with that spirit of reckless innovation which so frequently characterized its earlier decisions, directly held that the mere insolvency of the purchaser was sufficient to invalidate a sale; but that case has since been overruled, and hence it is no longer authority even in California. (*Bell* v. *Ellis*, 33 Cal.) Nor do we find that the reasoning of the Court in *Seligman* v. *Kalkman* so cogent and convincing as to justify the adoption of the rule there announced in opposition to the general current of authority both in this country and in England. It is true this Court is not neces-sarily bound by the decisions of the Courts of other States where they are manifestly not supported by reason; still as those decisions in a great measure constitute the common law of our country, they are usually entitled to great weight, and should not be disre-garded except where clearly and manifestly incorrect; and indeed not even then if the decisions are numerous and uniform, for it is generally more mischievous to unsettle even an incorrect rule, which is thoroughly established, than to adopt and follow it. But the law upon the question under consideration is, we believe, not only maintained by the authorities, but also founded upon correct principle, as the reasoning of the judges in the various cases in which the subject is discussed will demonstrate. Hence we have no disposition to follow the doctrine announced in *Seligman* v. *Kalk-man,* but prefer to follow the rule so well established the other way. (*Smith* v. *Smith et al.,* 21 Penn. State R. 367; *Buckley et als.* v. *Artcher,* 21 Barb. 585; *Mitchell et als.* v. *Worden,* 20 Barb. 253; *Cross* v. *Peters,* 1 Greenleaf, 378.)

Any false representations or artifice, however, by the purchaser, if the seller is thereby induced to part with goods which otherwise he would not have done, will always invalidate the sale, for actual fraud invalidates all transactions. But false representations or fraud will not avoid a sale unless it appears that the seller was thereby induced to do that which he would probably not have done except for such fraud or deception. Although the law abhors all

deceit and double dealing, still it would be unreasonable to allow them to invalidate a transaction which they in no wise influenced.

If, therefore, it is made apparent that the false representations had no influence upon the action of the vendor, they will not avoid the sale. "In the first place," says Parsons; "it is obvious that the fraud must be material to the contract or transaction which is to be avoided because of it, for if it relate to another matter, or to this only in a trivial and unimportant way, it affords no ground for the action of the Court. It must therefore relate distinctly and directly to this contract, and it must affect its very essence and substance. But as before, we must say that there is no positive standard by which to determine whether the fraud be thus material or not. Nor can we give a better rule for deciding the question than this: if the fraud be such that had it not been practiced the contract would not have been made or the transaction completed, then it is material to it; but if it be shown or made probable that the same thing would have been done by the parties in the same way if the fraud had not been practiced, it cannot be deemed material." (2 Parsons on Contracts, 267.)

The law as established by the cases upon this subject may be briefly summed up in this manner: First—That the mere insolvency of the purchaser, if no false representations are made and no artifice is employed, will not avoid the sale. Second—Any false representations made by the purchaser to the vendor by means of which the latter is induced to part with property, which were it not for such representations he would not have done, will avoid the sale, whether the purchaser be solvent or insolvent. Third—The sale will be avoided when a purchaser, knowing himself insolvent, purchases goods with the intention of not paying for them, although no false representations are made by him. (*Ferguson* v. *Carrington,* 9 Barn. C. C. 59; *Ash* v. *Putnam,* 1 Hill, 302.)

Assuming that the insolvency of a purchaser will not in itself invalidate a sale, two questions only then remain to be answered in this case: First—Were the plaintiffs influenced in the sale of the goods in question by the false representations made by Grange; and, Second—Was it the intention of Grange not to pay for them at the time of purchase?

If the testimony of the plaintiff Joseph Klopenstein is taken as the full and correct version of the conversation which took place between himself and Grange at the time of the first sale of goods, there could be no possible hesitation in concluding that the plaintiffs were not induced to sell goods to Grange by any misrepresentations as to his financial condition. According to this testimony the only misstatement made by Grange was in answer to the question as to how much he owed Peake & Co., his answer being " a little less than four thousand dollars," when in fact he then owed that firm four thousand three hundred dollars. But can it be believed that the plaintiffs would not · have dealt with him precisely as they did had they been correctly informed that the debt to Peake & Co. was forty-three hundred dollars; certainly not, for there seems to have been no disposition on the part of Joseph Klopenstein to ascertain accurately the amount of Grange's liabilities. Judging from his own testimony, the purpose seems to have been only to get a very general idea of his financial condition. Indeed, Klopenstein appears to have been indifferent even as to the exact number of thousands in which his customer was indebted. The statement by Grange that he owed Booth & Co. a balance of a " few thousand dollars," although as indefinite as it possibly could be, seems to have been satisfactory. With this apparent indifference as to the exact amount of indebtedness it is impossible to believe that three hundred dollars more or less would have influenced the plaintiffs' action. Nor indeed do they intimate that had they known the exact sum due Peake & Co. it would have impaired Grange's credit with them in the slightest degree. If by the equivocation or misstatement of Grange the plaintiffs were not deceived or misled to their injury, the sale is not invalidated, for, as we have before stated, it must be shown that the artifice employed, or false representations made, influenced the vendor's action, before the sale can be held void. The testimony of Klopenstein then makes out no such case of fraud as will avoid the sales; but on the contrary, it shows affirmatively that the underestimate of the debt to Peake & Co. did not in any wise influence the credit given to Grange. It is true the version given by Grange of the conversation between himself and Joseph Klopenstein differs materially from Klopenstein's

statement of it, but the jury were instructed that " If at the time when Estrom & Grange made the first purchase of the plaintiff the firm was insolvent, and Grange on its behalf falsely misrepresented to plaintiffs that the firm was solvent in the manner stated in the deposition of Grange, and the testimony of Klopenstein, and upon the faith of such false statement the plaintiffs subsequently sold the goods sued for, or any portion thereof, then such facts are conclusive evidence of fraud, and plaintiffs are entitled to recover." And thus the question whether the plaintiffs were induced by any false statements of Grange to part with their goods was fairly left to the jury ; and their verdict being against the plaintiffs it negatives the assumption that they were influenced in their sale of the goods by any false statements, and that verdict is not so clearly against the weight of evidence as to authorize this Court to set it aside.   The jury seem to have taken Klopenstein's version of the conversation in preference to that of Grange—and we are not prepared to say that they did not do right.   But it is claimed on behalf of appellants that the letters written by Grange to the plaintiffs at various times after the first purchase in September were of a character calculated to deceive them as to the amount of business done by him. The jury, however, do not seem to have placed the same interpretation upon those letters which counsel placed upon them, nor do we find anything in them which would be likely to deceive the plaintiffs as to Grange's pecuniary condition.

The mention of the amount of sales by him upon some particular days was evidently not done for the purpose of deceiving the plaintiffs, for he adds :   " Of course we mention this day's sales as extraordinary for us.   Let us do half this business regularly and everything will be all right."   In another letter he mentions one day's sales which was larger than the average, but there is nothing in it to induce the plaintiffs to believe that such was the usual amount of sales per day.   It is not claimed that the amount of sales as given were overestimated, nor does it seem at all probable that the plaintiffs were deceived as to the amount of business which Grange was doing by the mention of the amount of sales upon two different days, when it is expressly stated that the sales upon one of these days was extraordinary, and it is evident from the context

of the letter that the amount upon the other day was given as un-usual.   As the case was fairly and fully submitted to the jury we do not feel warranted in setting aside their verdict upon the evidence as it is presented to us.

Upon the second point it is only necessary to say that there is no evidence whatever in the record tending to show that Grange did not intend to pay for the goods at the time of the purchases ; but on the contrary, it is very clear that he did, for it is shown that he fully paid for his first purchases, and paid a thousand dollars or more upon the purchases made afterwards.   And he testifies himself that he honestly intended to pay, and believed at the time he obtained the goods that he would be able to do so.   As the instructions given by the Court were in accordance with the law as we have stated it, any special discussion of them is rendered unnecessary.

Judgment affirmed.