## BURCHINELL v. HIRSH ET AL.

**1. EVIDENCE—COMMERCIAL REPORTS.**
Vendors who rely upon statements made to commercial agencies to set aside sales as against attaching creditors must make clear and satisfactory proof both of the representations and their falsity. Reports of commercial agencies are admissible as an element of proof, but must be supplemented by evidence of actual representations made by the vendee, and such evidence must be a substantial narration of the vendee's statements, which in turn must be in effect, if not an accurate restatement, reproduced in what was furnished the seller.

**2. FRAUD—DISAFFIRMANCE OF SALE.**
The rights of attaching creditors cannot be affected unless the vendor can sustain his title to the property by clear and convincing evidence of fraud on the part of the vendee, and the burden of proof is on the vendor.

**3. SAME.**
To constitute such fraud in the purchase of goods as will authorize the seller to disaffirm the sale and maintain replevin for the property, the buyer must have had, at the time of the purchase, the intent and design not to pay.

4. VENDOR AND VENDEE.

As a general rule, a buyer is under no obligation whatever to furnish unsought information either as to his present or his changed financial condition; and although after he had made statements to commercial agencies he found his financial condition altered so that in some substantial respect his statement would not be true, he is not bound to publish his insolvency.

*Appeal from the District Court of Arapahoe County.*

Mr. ALFRED MULLER, for appellant.

Mr. T. J. O'DONNELL and Mr. W. S. DECKER, for appellees.

BISSELL, P. J., delivered the opinion of the court.

This replevin suit grew out of a dispute between the vendors and attaching creditors of a bankrupt merchant. During 1891, David Cohen was dealing in ready-made clothing and its usual accessories in the city of Denver. In the latter part of that year, some of the employees of the commercial agencies of Dun & Co., and Bradstreet & Co., obtained from Cohen information respecting his financial affairs. About the same time he transmitted to Benjamin & Co., of New York, a statement of his assets. In April, 1892, the appellees, Hirsh, Elson & Co., through their traveling salesman, sold Cohen a bill of goods, which was ultimately paid. In the following July, he made a further statement to one of the agencies. In October, Hirsh, Elson & Co. sold the goods which are the subject of this litigation. Cohen did not pay for them. He had gradually become embarrassed, and quite a number of his creditors commenced attachment suits against him, and levied on his stock and other property to enforce the collection of their debts. Under the levies, the sheriff took the goods which Hirsh, Elson & Co. had sold in October.

In the statements which he furnished the agencies, and in the letter which he wrote Benjamin & Co., Cohen included an interest which he had in some lots in one of the additions

to Denver, and an interest in some property near Chicago. The Chicago property was held by an association. His interest was equivalent to what he stated about his title, though the witnesses generally unite in saying that his representation was substantially that he had a certain interest in that particular property. After he made the statement in July, he exchanged the lots for a piece of improved property nearer Denver. Both the lots and the property taken in the trade were incumbered, but the terrace property was of equal value, and not more heavily incumbered than the unimproved lots which Cohen had previously owned. When the attachment suits were begun, his commercial liabilities amounted to a little upwards of eleven thousand dollars. His stock in trade and his fixtures were not enough to liquidate the debt. If coupled with the value of his real estate (as the testimony showed it to be), Cohen was not insolvent, but had some two or three thousand dollars over and above his debts, assuming, of course, that he was able to turn his land into money, and realize on whatever bills receivable he might own. The two bills of goods which Cohen bought of Hirsh, Elson & Co. were sold through a traveling salesman, to whom nothing was ever said after the statements in April, when that lot of goods was purchased. He then told Alexander something about his affairs, and referred him to Benjamin & Co. Hirsh, Elson & Co. were apparently satisfied with what they learned, and made the October sale without further inquiry. On this basis, Hirsh, Elson & Co. replevined the goods. They contend that, under the circumstances of the sale, the title to the goods did not pass as between vendor and vendee, and they could reclaim them, even from attaching creditors. In support of their title they undertook to make proof of what Cohen had stated to the commercial agencies, of what Benjamin & Co. had communicated to them, and of the amount of assets which Cohen had when he bought the goods. For this purpose, they put Cohen and the clerks of the agencies on the stand. When the clerks who collected the information were produced, they were asked

what Cohen had stated concerning his affairs. Only one of them produced his report to the agency. The other brought what purported to be a copy. Neither of them undertook to state precisely what Cohen had said. They could only testify that when they made their inquiries they took down certain memoranda, and from those memoranda were able to speak generally about his statements. The reports which were furnished to Hirsh, Elson & Co. were produced. When the plaintiffs endeavored to show by Cohen that the statements were not true, they met with very little success. The invoice of the sheriff, which was probably not very much in excess of the values, very clearly showed that the stock was worth in the neighborhood of eleven thousand dollars. The only difference between the representations and the facts, if any, lay in the difference between his statement of the value of his realty and its actual worth. Cohen's evidence was the only proof on this subject. It was proven by an abstractor that he had no title to the lots in Hartman's Addition, but it was clearly demonstrated that Cohen had traded for the Broadway Terrace. This property was worth as much as the lots. This we must assume, for there was no evidence disputing it. Cohen was interrogated concerning these statements in July, and testified to their accuracy and their truth. He likewise testified that he purchased the goods in good faith, and intended to pay for them when he bought them. There is nothing to impeach this statement, unless we are at liberty to assume it to be inaccurate, because he subsequently failed to pay, and was found to be insolvent when the parties attempted by their attachments to realize enough to pay all the claims.

When the case was concluded, the court gave several instructions to the jury. The jury were told that if they believed the statements were false, and Cohen's condition was not as he gave it, and the plaintiffs, relying on the reports, sold the goods, they must find for them. The court further told the jury, even though they might find from the evidence that the statements were substantially true when

made, yet, if afterwards, Cohen's financial condition was substantially changed, and the jury believed "that at the time of the purchase of the said goods in controversy from the plaintiffs by said Cohen, the financial condition of said Cohen was substantially different from the report and statement made by Alfred Benjamin & Co., and the report made to Bradstreet's Agency in 1892, then it became and was the duty of . said Cohen, before purchasing said goods of the plaintiffs, to make a statement to the plaintiffs of the change which had taken place in his financial condition ; or, if you believe from the evidence that at the time of the purchase of said goods in controversy from the plaintiffs, the said Cohen had no reasonable expectation of paying for the same, and you further believe from the evidence that the plaintiffs sold the goods to said Cohen, relying upon the statements made by said Alfred Benjamin & Co., and the said report to said commercial agency, then, in that case, it is your duty to find for the plaintiffs." Acting under these instructions, the jury found with the plaintiffs, and the attaching creditors appealed.

The equities here are manifestly with the diligent creditors who instituted the suits to collect their debts, and the appellees are not entitled to maintain their judgment, even though the facts may have justified the verdict, unless the jury were aptly and correctly instructed respecting the law. We are not prepared to concede either proposition. We should not, however, disturb the judgment because we disagreed with the jury, but for the legal errors apparent in the record. Commercial agencies are well recognized instruments in the commercial world for the transaction of business between different places. They probably subserve a useful end, and in many ways are advantageous to those who are engaged in commerce. In the quick and rapid transactions of modern times, they are very much relied on to settle the question of the responsibility of the merchant who seeks to trade with the wholesale and jobbing house. Their means are doubtless subject to criticism, and they are often used to the detriment

of the merchant, as well as to his advantage. As an original proposition, I should be very much inclined to doubt whether, in the absence of a specific purpose on the part of the buyer to deceive a particular seller, a statement made to a commercial agent, even though the agent might report it to his foreign correspondent, could be made the basis of an action for false representations. I should also question whether a vendor could rescind a sale on the hypothesis that he had been led to make it because of what was reported to him by the agency, without ample and satisfactory proof that the statement was made to the agency with both knowledge and intention on the part of the vendee that it was to be transmitted or furnished to that vendor. There are, however, some cases which declare the doctrine and hold that a representation made to a commercial agency, without reference to any immediate transaction between the one making it and some other, may still be proven by a vendor who, relying on it, makes a sale after he has received a report which embodies substantially what the merchant has said. We are not disposed to dissent from the authorities on this subject. We prefer to say, admitting that this is the law, vendors who rely on it to set aside sales as against attaching creditors must make clear and satisfactory proof both of the representations and their falsity. The trouble with most of these agencies is this: they do not rely on what the merchant has stated as much as they do on the general information respecting his financial status which they are able to gather in the community. The reporters combine what has been stated with what they have been able to learn, and many times color it as their interests or information may warrant, so that when the report reaches the foreign correspondent, it is a far different thing from an accurate transcript of what the home merchant has said. Probably the reports which are furnished the vendor would be admissible as an element in the proof, but they must be supplemented by evidence of the actual representations which were made by the buyer. This would not be accomplished by producing the reports which the clerks made to the

home office. The evidence in this regard must be a substantial narration of the buyer's statements, which, in turn, must be in effect, if not an accurate restatement, reproduced in what was furnished the seller. The rules of evidence permit no other method of proof, and the rights of attaching creditors cannot be affected, unless the vendor can sustain his title by clear and convincing evidence of the fraud of the vendee. The burden should be placed on the vendor. He has parted with the possession of his goods. The sale is complete. Credit is given. The purchasers have a title which is indefeasible, if they got title at all. To invalidate the transaction, the seller relies on the falsity of a statement which was made to an agency, and was made perhaps months before the transaction in question, and, virtually, to the public generally, and without specific intent. It is not inequitable to require him to make close, strict and satisfactory proof, both of the representations and their falsity. The testimony in the present case did not rise to that level in either particular. The clerks who claimed to have interviewed Cohen were produced; their memory of what he said was neither clear, accurate, nor positive. But waiving the unsubstantial and unsatisfactory character of their evidence, which should have been submitted to the jury with instructions respecting it, the case lacked evidence of the falsity of the representations.

The plaintiffs produced one witness who had examined the records and failed to find the lots in Hartman's Addition which Cohen said he owned. There was some discrepancy between the facts and what one of the agency's employees said concerning Cohen's statement respecting the title to the Chicago property. Nothing further was offered on this subject. The first was entirely destroyed by Cohen himself, who was put on the stand by the plaintiffs. It appeared from his testimony that the July statement concerning the Hartman lots was absolutely true. After that date the lots were not sold, but were traded for other improved property in Broadway Terrace, which was of equal value. That much then of his statement was not false. It is assumed by counsel that

they have a right to eliminate the real estate value from this statement, in order to demonstrate the falsity of his representations. The argument is a *non sequitur*. The representation that he owned the lots was accurate. His opinion of the value was another proposition. On it a false representation can hardly be based. The difference between the facts and the statement which Cohen made about the Chicago property was unsubstantial.

There is another matter to which attention must be directed before the general principles of law which will be applied to the instructions can be understandingly stated. There was nothing in the evidence to show that Cohen had any design to defraud Hirsh, Elson & Co., when he bought the goods. The case is barren of proof even tending in that direction. The only thing which admits of that construction, or of an argument respecting it, must be drawn from the fact that when his assets were seized by the sheriff, they did not yield on execution sale enough to pay his debts, a circumstance which would probably apply to the property of most men in business if they were suddenly called upon to liquidate. In fact, Cohen directly testified that he purchased the goods in good faith, and fully intended to pay for them. This he might have done but for the pressure of the panic, which had then already commenced to be felt.

This statement and argument must satisfy the professional mind that the court did not instruct the jury in accordance with the law. There are two phases of the instruction which is quoted to which attention must be directed. The jury were told substantially that if they believed from the evidence that Cohen, at the time of the purchase, had no expectation to pay, their verdict must be for the plaintiffs. This does not accord with the law. The instruction lacks a fundamental element required by all the cases, to wit, a design not to pay. Some of the authorities undoubtedly go to a great length in requiring definite proof of facts from which the intention not to pay can be fairly and easily demonstrated. Others lack that vigor of expression, and will permit the jury to infer the

design and intent not to pay, providing they find from the proof enough to satisfy them that the intention existed. Some perhaps go still farther, and permit the jury to infer the intent not to pay from proof of the insolvency of the buyer at the time of the purchase, but there is no well considered case, which we approve, which permits an instruction in the form which the court adopted in this case. A reasonable expectation not to pay is not enough. The jury ought to have been carefully instructed that they must find the buyer had the intent and design not to pay at the time he made the purchase or the title would pass. *Gavin v. Armistead*, 57 Ark. 574; *Reticker v. Katzenstein & Wachtel*, 26 Ill. App. 33; *Armstrong v. Lewis*, 38 Ill. App. 164; *Morrill v. Blackman*, 42 Conn. 324; *Garbutt et al. v. Bank of Prairie Du Chien*, 22 Wis. 384; *Zucker v. Karpeles*, 88 Mich. 413; *Redington & Co. v. Roberts*, 25 Vt. 686; *Swarthout v. Merchant*, 47 Hun, 106; *Hotchkin v. The Third Nat'l Bk.*, 127 N. Y. 329; *Gainesville Nat'l Bk. v. Bamberger, Bloom & Co.*, 77 Tex. 48; *Wheeler & Wilson Mfg. Co. v. Keeler*, 65 Hun, 508; *Klopenstein v. Mulcahy*, 4 Nev. 296; *Smith v. Smith, Murphy & Co.*, 21 Pa. St. 367.

These cases, with many others, hold the necessity of proof of a fraudulent intent on the part of the buyer at the time of the transaction. Few of the states go to the extent of the Pennsylvania cases. Personally, I am not prepared to quarrel with that court. They have rested their decisions on a broad and impregnable basis. To entitle the vendor to rescind the sale as against the subsequent vendee or attaching creditor, when he has parted with the possession of his goods, he should be able to show an actual artifice and design whereby he was misled; otherwise the sale must stand. If all the cases pursued this well defined policy, there would be much less litigation of this description. We do not so declare the law, because the current is the other way, but we do insist that there must be some proof of design, or some evidence offered from which the jury would be at liberty, under well defined and well stated rules of law, to find that the intent·

existed. In this case, there was no such proof. The jury would not have been warranted on the case made to find the existence of such intent. It was expressly negatived by Cohen's own testimony, and by all the circumstances surrounding the transaction.

The other part of the instruction which has been quoted is subject to even stronger criticism. In it the court left the level of common every day life and entered a moral region with which few men are familiar. The jury were told that if, after Cohen had made his statement to the commercial agencies, he found his financial condition altered, so that in some substantial respect his statement would not be true, he was bound to publish the fact of his insolvency. There is no such responsibility. As a general proposition, the buyer is under no obligation whatever to furnish unsought information, either as to his present or his changed condition. We do not intend to decide that when there have been dealings between the parties, and the purchaser has become absolutely bankrupt, or has reached a financial condition which would warrant the inference and amount practically to proof of a design not to pay, and render the transaction a fraud on the seller, he may withhold information of his condition. No such case is presented. If there was any change in Cohen's condition, there was no such radical alteration as would even tend to establish a fraudulent purpose. There was nothing to evidence a design not to pay. The language of the instruction, " if they found Cohen's condition substantially changed," was not sufficiently guarded, restricted, and well defined. The court left out of it the idea which should have been its controlling feature, to wit, the fraudulent purpose. This is more manifest from the conclusion which directs the jury to find with the plaintiffs if they conclude Cohen had no reasonable expectation to pay. The folly of the principle is apparent. No merchant struggling under difficulties could survive a communication of this sort twenty-four hours. Every creditor would become a suitor, and every suit would be begun by attachment. The instructions were erroneous.

For the errors which were committed by the trial court as they have been stated, this case will be reversed and remanded for a new trial in conformity with this opinion.

*Reversed.*