CURTIS BROTHERS & COMPANY, Appellant, vs. HOXIE and another, Respondents.

*May 2 — May 25, 1894.*

*Attachment: Debt fraudulently contracted: Statements to commercial agencies: Appeal: Evidence: Transactions with person since deceased.*

1. An order discharging an attachment will not be reversed on appeal, except upon a clear preponderance of the evidence against the finding of the court below.

2. In November, 1889, defendants made a statement to a commercial agency, showing assets about $250,000 in excess of liabilities, and naming plaintiff and others as references. In May, 1890, they orally stated the same thing to one V., who was collecting information for another agency. These statements greatly underestimated defendants' liabilities, but the evidence tends to show that they were made in good faith and that defendants did not know they were insolvent until they made an assignment in September, 1890. Plaintiff's manager saw the former statement and also talked with V., who told him the substance of the oral statement and that he had learned from other sources that defendants were practically what they represented themselves to be. Plaintiff had had frequent transactions with defendants for several years, and had knowledge of their business methods and the character of their

enterprises, which were widely extended and of a somewhat precarious and uncertain nature. Between April 2 and September 1, 1890, plaintiff sold to defendant on credit merchandise to the amount of $30,000, the principal item being $21,000 worth of lumber which, it appears, plaintiff was anxious to sell to them and defendants were reluctant to purchase. During these transactions the defendants' statements were not mentioned, but plaintiff's manager testified that in extending the credit he relied on the written statement of November, 1889, corroborated by the statement to V. Upon the evidence, showing the above facts among others, it is *held* that there was no clear preponderance of proof that the debt was fraudulently contracted, so as to sustain an attachment.

3. Under the circumstances, the statement of November, 1889, was too remote to justify the plaintiff in relying upon it absolutely; and the defendants were not responsible for what V. told plaintiff's manager, he having no authority, express or implied, from them to make such statement.

4. After the death of one of the defendants, the survivor's son, who had no interest in the suit and from whom neither party derived any interest, was competent to give evidence of conversations with the deceased in his lifetime.

APPEAL from the Circuit Court for *Langlade* County. This is an appeal from an order of the circuit court for Langlade county vacating the attachment issued in the above action. On the 6th of September, 1890, Hoxie & Mellor, partners, etc., were indebted to the plaintiff in the sum of $30,032.52 upon demands not then due, for the recovery of which this action was brought, and a writ of attachment was issued in the manner prescribed by law upon an affidavit made by Cornelius S. Curtis, the general manager of the plaintiff, alleging as cause therefor that he had good reason to believe, and verily did believe, that the said defendants had assigned, conveyed, and disposed of, or were about to assign, convey, dispose of, or conceal, their property, with intent to defraud their creditors; also, that the defendants fraudulently contracted the debt respecting which this action is brought. The defendants traversed the affidavit, denying the existence of the causes alleged

for the attachment.  On the same day the attachment was levied, and immediately thereafter, Hoxie & Mellor made a voluntary assignment to Charles V. Bardeen of all their property, etc., for the benefit of and in trust for their creditors, excepting property exempt from execution.  The assignee also intervened and made a similar traverse of the affidavit for the attachment.  Before the trial, *Lyman E. Barnes* had become such assignee in the place of Bardeen, and was substituted in his place.  The defendant's counsel suggested the death of E. N. Mellor since the commencement of the action, and it proceeded against his surviving partner as such.

For the appellant there was a brief by *Winkler, Flanders, Smith, Bottum & Vilas*, and oral argument by *C. E. Wild* and *J. G. Flanders*.

For the respondents there were separate briefs by *Charles W. Felker*, attorney, and *Charles Barber* and *Thompsons, Harshaw & Davidson*, of counsel, and the cause was argued orally by *Mr. Felker, Mr. Barber*, and *Mr. C. E. Thompson*.

PINNEY, J.  1. The issues raised by the special answer and affidavit for the writ of attachment are: (1) Whether, at the time it was issued, the defendants had in fact assigned, conveyed, and disposed of, or were about to assign, convey, dispose of, or conceal their property, with intent to defraud their creditors; (2) whether the defendants fraudulently contracted the debt respecting which the action was brought.

Proof of good reason on the part of the creditor to believe the truth of the charge is not sufficient to sustain the attachment, but the substantive charge itself must be proved.  *Davidson v. Hackett*, 49 Wis. 186.  And the affirmative of the issues is on the plaintiff.  R. S. sec. 2745. An order discharging the attachment will not be reversed

on appeal, except upon a clear preponderance of the evidence against the finding of the court below. *Rice v. Jerenson*, 54 Wis. 248; *Lord v. Devendorf*, 54 Wis. 491.

The evidence is very voluminous, extending over 500 printed pages, and the trial in the circuit court appears to have been a very lengthy and laborious one. The difficulty of arriving at a correct conclusion upon questions of fact by an appellate court, which, in the nature of the case, cannot have the time and obvious advantages possessed by the court below in arriving at a result, has been frequently pointed out, and fully justifies the rule stated in *Lord v. Devendorf, supra*, and in many other cases, repeatedly applied to the review of mere questions of fact by an appellate court. Mellor, one of the defendants, although examined under sec. 4096, R. S., before trial as an adverse party, died before the trial, and the fraudulent acts charged as foundation to warrant the attachment are claimed to have been done or committed by him only, while *Hoxie*, the surviving partner, is in no way inculpated, except constructively by reason of his copartnership relation with Mellor. An elaborate statement of the evidence and of our reasons for the conclusions at which we have arrived would serve no useful purpose, and we shall content ourselves with a somewhat general statement of our views. We are clearly of the opinion that, considering all the evidence, no cause for the attachment was satisfactorily shown under the first charge in the affidavit, namely, that the defendants had assigned, conveyed, and disposed of their property, or were about to do so, or conceal the same, with intent to defraud their creditors. The transactions relied on in support of this charge were not necessarily or legally fraudulent, and the evidence, we think, wholly fails to show that they were entered into with the fraudulent intent upon the part of the defendants, or either of them, charged in the affidavit. The evi-

dence in support of this charge is, for the most part, uncertain and inconclusive, and is, we think, in all material respects met and satisfactorily explained by the evidence on the part of the defendants.

2. The more difficult question is whether it appears from a clear preponderance of proof that the defendants fraudulently contracted the debt respecting which the action is brought. It appeared, in substance, that the defendants had been carrying on a very extensive business in logging, lumbering, and merchandise in northern Wisconsin and Michigan, at Antigo, Bessemer, Marinesco, Bryant, and Ironwood, from 1885 down to the time they assigned (September 6, 1890), and that the plaintiff, an Iowa corporation, having an office at Wausau, Wis., had numerous and frequent business transactions with them down to the latter date, which had been conducted on its part by C. S. Curtis, its general manager. Plaintiff was a manufacturer and dealer at Wausau in sash, doors, blinds, and lumber, and sold the defendants during the year 1890, from April 2d to September 1st, lumber and merchandise to the amount of $30,032.52, of which $21,000 was for a lot of lumber at Marinesco, sold June 13, 1890. Curtis, the plaintiff's general manager, testified that he extended credit and times of payment on the other bills, and relied in so doing on the statements made by defendants to the commercial agency, one of which, signed " Hoxie & Mellor," to R. G. Dun & Co., and dated " November 26, 1889," was put in evidence, and was upon a printed form for answers to various interrogatories, many of which were not answered. It contained various items of assets and liabilities, showing total liabilities of $250,000, amount of assets over liabilities $254,000, and it stated at the foot: " The above is a true and accurate statement of our assets and liabilities, and is presented as a basis of credit through the reports of the mercantile agency,"— and was signed in the name of the firm by the

defendant Mellor, and it stated that the firm did a banking business with the National Bank of Oshkosh and Bank of Antigo, and named as references said banks; W. W. Hutchinson, Antigo; *Curtis Bros. & Co.*, Wausau. One Van Horn, a traveling collector of information for Bradstreet's Commercial Agency, testified that he had called on defendants at Antigo the latter part of May, 1890, and that Mellor gave him a partial statement; that he said he had recently made to that house a substantially correct statement, but that their assets then were $495,000 and liabilities $235,000; that he, Van Horn, told Curtis at Wausau the substance of the statement in a conversation, in a general way, as to the reliability of the defendants, and gave him what he had ascertained on the outside as agent for his company; that he made those inquiries of banks and other parties, among others of one Trever, the Bank of Antigo, and Langlade County Bank, and found out that they were practically what they represented themselves to be. Thinks he told Curtis what he found outside, as well as what Mellor told him. Saw Curtis again on the train, and he seemed more interested. Saw him four or five days after that, when they talked it over quite lengthily. The plaintiff was then a subscriber to the Bradstreet Agency. It makes up a book with ratings in it yearly, which it sells or leases to subscribers, and with detailed reports on the books in Milwaukee, which are furnished on application to subscribers. Hoxie & Mellor were subscribers at the time.

The witness Curtis testified that he first saw the statement put in evidence at the First National Bank of Wausau, about January 1, 1890; that he was a member of the discount committee, and this was when engaged in passing on Hoxie & Mellor's paper; that he remembered the net balance of assets stated on it to be $254,000, but he had been unable to find the paper; that he was the credit man of the plaintiff at Wausau, and relied in extending the

credits to Hoxie & Mellor "on that statement, *corroborated by the statement of Van Horn;*" that he had a conversation with Mellor, just prior to bringing the action in Antigo, as to the financial condition of the firm in June, 1890, and he said they had two dollars in assets to pay every one in liabilities; that on account of illness of their bookkeeper he could not tell what their liabilities were,— the books were not posted, and he could not tell exactly. This was September 1, 1890. On the 6th of September Mellor still held that the firm owed about $300,000. The $21,000 sale of lumber at Marinesco to defendants embraced all the stock the plaintiff had there, it having sold out its interest in the mill at that place. Plaintiff's first item of account with defendants in 1890 was under date of April 2d, to the amount of $48.46, but it seems there might have been some notes or an account against them besides.

After the assignment, a statement of the affairs of the defendants was made by one Bartz, as an expert accountant, who had until then been head man in the plaintiff's office, when he went into the employ of Bardeen as assignee. It appeared that Mellor issued commercial paper of the firm in large sums to be sold by J. H. Weed. The latter had $80,000 or $90,000 or more, for which the defendants claimed he had not accounted, and owed them that sum, and the defendants had also become accommodation indorsers of A. Weed & Co. for about $80,000. It appears that these transactions were not all, or only in a small part, entered on the books of Hoxie & Mellor, but Mellor kept an account of them in a small book he carried in his pocket. The amount of liabilities was swelled beyond the statement in evidence, mainly by these and similar items of paper issued to be sold for the defendants, and for which they claimed they had not received consideration, and by contingent liabilities and accommodation paper. *Hoxie* let Mellor run the business, and never paid any attention

to it until the attachment. He lived at New London. He testified he knew that Mellor was doing a big business, and that Mellor never told him the amount of assets or liabilities until the attachment. It appears from the evidence that the books of Hoxie & Mellor were kept in a very imperfect and incomplete way. Mellor did the financial business, drew checks, made notes, sales, and purchases, etc., and reported what he did, as was necessary, as he says, for Larson to make entries on the books. Along in 1885–6–7–8 they did a business of about $300,000 a year, and in 1889 and 1890 about $500,000 a year. Did not take an account of stock and trial balances from year to year. Did not get time. Mellor testified that he supposed the statement made to the R. G. Dun & Co. Agency was true when he made it, and that he made it partly from books and partly from estimates; that he knew that credit was extended on the basis of such statements; that he got it as near right as he could. He denied knowing Van Horn, or making any statement to any one at Antigo who had called on him from Bradstreet's Agency; that he was not solicited to make any such statement, but may have talked at Antigo with some one from that agency, but not in May or June, 1890, in reference to the affairs of the firm; that they issued paper to J. H. Weed to sell to the amount of $90,000, from which they got no returns. Larson says he did enter on the books notes issued by Hoxie & Mellor when reported to him; that he never furnished Mellor with a balance sheet of the books at Antigo, and he never required one; that Mellor did not look over the books during the last four or five months, and that he did not tell Mellor what the books showed to be the condition of the firm. Up to the time of the attachment on the Ironwood property, just before the assignment, the firm had had no difficulty in meeting their obligations; that he and Mellor believed the firm able to meet their obligations.

It was clearly shown that the statement made to the R. G. Dun & Co. Agency was very inaccurate, particularly in that the liabilities of the firm were largely understated. The expert Bartz, already mentioned, prepared a statement as shown by the books, *papers, and vouchers, etc.*, of Hoxie & Mellor, showing that the amount of their indebtedness *when the statement was made* was $479,507.34, and this did not include the accommodation paper issued to A. Weed & Co. and some other matters. He testified that the books and vouchers, etc., of Hoxie & Mellor in the hands of the assignee showed that their indebtedness, January 1, 1890, was $618,655.81; that the liabilities of the firm in June, 1890, as shown by the books and vouchers, etc., in the hands of the assignee, were $780,619.82; that the amount of paper issued by Hoxie & Mellor and indorsed by J. H. Weed during the year 1890 was $383,500. He detailed the methods pursued by him in making up his statement, and submitted elaborate statements covering many printed pages in respect thereto. This statement was made after the attachment and assignment. On the other hand, a statement by Carlton Wells as an expert was produced, differing widely from the one prepared by Bartz, compiled *from the books* of the firm, showing that the assets, November 26, 1889, the date of the statement, were $524,983.96, and the liabilities $274,697.02, corresponding in result very nearly with the statement in evidence; that their assets, January 1, 1890, appeared to be $541,183.42, and their liabilities $262,469.49,— net assets, $278,713.93; that at the time of the assignment the amount of assets, as they appeared from the books, was $635,164.47, and the liabilities $434,503.75. The assignee's report as to assets was the same, and as to liabilities $568,158.12. The testimony of the respective experts was very lengthy and elaborate, and the statements defy all attempt at condensation or examination within the limits of an opinion.

The evidence shows that the plaintiff was quite anxious to make the sale of the Marinesco stock of lumber, amounting to about $21,000, and that the defendants were rather reluctant to purchase it. A. E. Hoxie, son of the defendant *Hoxie*, was at Marinesco when the bargain was made, and heard part of the talk, and knew that it was closed at that time; that Mellor told Curtis that he would give him $75 if he would let him back out and say nothing more about it, but did not hear Curtis reply or anything further said about it; that he thought Mellor meant just what he said, but that he was directed to scale the lumber. Another witness, Paine, said that Mellor said to Curtis he had rather give $75 if Curtis would let him off from the sale. The latter said the lumber was cheap enough, and, as he was going out of there, Mellor would make money buying it.

Evidence was offered and received tending to show that in the ordinary course of business, in making statements or reports to commercial agencies for concerns of the character and kind of Hoxie & Mellor, it was not customary to include in their liabilities accommodation paper, and also tending to show that it was a method, quite common, of raising money by issuing notes to note brokers to sell. The evidence tended to show that Mellor really believed that his firm was solvent up to the time of the attachment on the Ironwood property, and, with temporary assistance, could get over its present difficulties and go on, and also tending to show that the statement made to R. G. Dun & Co. was made in good faith, though it appears to have been a very inaccurate or mistaken one, particularly in regard to their liabilities; and the evidence tended to show that Curtis, the general manager of the plaintiff, had, in a general way, knowledge of the kind and character of the business and general business operations of Hoxie & Mellor. It does not appear that at any time in the course of its business transactions with that firm he asked them for any

statement as to their financial condition until a few days before the assignment, and this subject does not appear to have been alluded to in any way at the time of the sale of the lumber at Marinesco for so considerable an amount as $21,000, nor does it appear that the statement to the R. G. Dun & Co. Agency was ever mentioned by Curtis to the defendants or any one else until a few days before the attachment.

The statement made by the defendants to the R. G. Dun & Co. Agency was too remote from the transaction in question, in view of the knowledge the plaintiff had of the defendants' business enterprises and methods, and of the business relations which had existed between the parties for over four years, to reasonably justify the plaintiff in absolutely relying on this representation of the defendants as a basis of credit for so large a sum, without any attempt to obtain from them or other sources further information on the subject. It was made November 26, 1889, and Curtis saw it in January, 1890, and the main transactions between the parties were about seven months after its date. Upon its face it does not seem to have been intended as a basis for the action of the plaintiff or the banks named in it, for they were the parties the defendants named as references to whom the commercial and business public might refer to vouch for the reliability of the statement and for the standing and responsibility of the defendants. When Curtis saw this paper he must have observed its obvious import in this respect, and that the plaintiff was being held out to the world as vouching for the statement in a manner that might be highly prejudicial to the interests of others. With knowledge of the character of the statement, investigation became a duty, both for the protection of the plaintiff if it expected to act on it as a basis of credit, and in fairness to protect others who might rely on it by reason of the reference to the plaintiff. It does not appear

that it took any action on the subject, but left the matter
with the sanction of its name to give credit to the state-
ment, and it is difficult to see how it lies with the plaintiff
to say that it was misled by a statement not clearly in-
tended to influence its action, but with the aid of its sanc-
tion to influence others.  Looking to the extrinsic facts,
and they must be considered to judge of the probable effect
of the statement on the plaintiff, in any other view, we find
that there was no apparent reason for the plaintiff to re-
quire or the defendants to make any such statement, when
their standing, character, and extent of their business, and
general methods in which it was carried on, must have been
well understood by the plaintiff in consequence of its former
long-continued business relations with the defendants.

It is material to note that it does not appear that men-
tion was ever made of this statement by Curtis, the plaint-
iff's general manager, to the defendants or to any one else
until a few days before the attachment was made, notwith-
standing so large a deal as that for the lumber at Marinesco
for $21,000, and one probably out of the usual course of
business, took place between them; a transaction, it ap-
pears, the plaintiff was quite anxious, and the defendants
rather reluctant, to make,— so much so that they offered
to give $75 to have the sale abandoned or declared off.
This is certainly strong evidence to show the statement in
question was not made with intent to defraud and deceive
the plaintiff, or to secure or bring about a sale of the prop-
erty to the defendants without an intention on their part
to pay for it, or with intent to defraud the plaintiff.  The
statement does not appear to have been put forth as a de-
vice or means to influence any matter then in hand between
the parties, or to which it had any contemplated or near
relation, and there seems to have been an absence of any
intention on the part of the defendants to defraud or mis-
lead.

Curtis Brothers & Co. vs. Hoxie.

It appears to have been generally held, where an untrue statement to a commercial agency is relied on to affect a transaction made on the faith of it, that it is necessary, not only to show the falsity of the representation, but that, when it has no direct connection with the transaction then depending or about to be engaged in, it must be shown that the untrue statement was wilfully or intentionally made for the purpose of procuring credit from the plaintiff; but this case does not call for a decision on this point. This view is maintained in *Macullar v. McKinley*, 99 N. Y. 353, 357, restricting the doctrine of *Eaton, Cole & Burnham Co. v. Avery*, 83 N. Y. 31. The latter case holds that it is necessary that the statement be wilfully false, and that the question is material whether the representations were such as were calculated, under the circumstances, to deceive a prudent man. *Genesee Co. Sav. Bank v. Michigan B. Co.* 52 Mich. 164, 170, 438; *Victor v. Henlien*, 33 Hun, 549, 550.

Whether the plaintiff had a right to rely upon the representations contained in the statement is not a deduction to be made from its language alone, but from all the extrinsic facts and circumstances as well, as to whether it would be liable to influence the judgment and conduct of a prudent business man. Curtis testifies, it is true, that he extended credits to the defendants on account of the statement made by them to the commercial agency, and, on redirect examination, that he relied "upon the statement he saw at the bank, *corroborated by the statement made to Van Horn.*" It is evident from the testimony of Van Horn that Curtis was interested in seeking for information about the last of May, and a short time before the Marinesco sale, as to the responsibility of the defendants. He had three conversations on the subject with Van Horn, and he learned the substance of the partial oral statement made to the latter, and that, on inquiry by him at two or three of the banks and of one Trever, he "found out that

they were practically what they represented themselves to
be." As already indicated, we think that, under the cir-
cumstances of the case, and the remoteness in point of time
of the statement, he was not entitled to rely on it as a
basis of credit, and if he needed any assurance on that
point, or was in doubt, as his conduct tends strongly to
show he was, he ought to have called the attention of the
defendants to it at the time of the transaction in question,
or to have obtained information elsewhere. But he did
not take that course, and we are impelled to the conclusion
from all the evidence that, while he recognized the neces-
sity of further information, he relied on Van Horn's state-
ment and the recent inquiries he had made, together with
his knowledge of their standing, responsibility, and extent
of their business, acquired in the course of dealing between
the plaintiff and defendants for the past four years or more.
The defendants, however, are not responsible in any proper
sense for Van Horn's statement to Curtis. He was not
their agent or representative for that purpose, nor did they
make him any written statement. Van Horn was simply
in the employ of the Bradstreet Agency, collecting infor-
mation to enable it to rate the defendants and others, and
send such ratings out to their customers in the usual way.
He does not appear to have had any authority to do more,
or to give it out. We do not think the defendants can be
affected on this issue by Van Horn's statement to Curtis,
for he had no authority, express or implied, from the de-
fendants to make it. It was a material part of the plaint-
iff's case to show, not only that it had a right to rely, but
that in fact it did rely, on the statement in question. This
could not be presumed, and it was required to be shown by
a preponderance of proof. In consequence of the statute
as to the burden of proof, the defendants were not required
to prove to a demonstration that it was not relied on. It
was sufficient if this appeared by a preponderance of proof.

The case shows that in respect to the affairs of the firm of Hoxie & Mellor there were bad business methods and very imperfect bookkeeping, and that they probably lost largely on account of their accommodation paper and by paper placed in the hands of note brokers for sale. The failure which occurred was a probable, if not necessary, result of a want of good judgment and business prudence in the management of a business very widely extended and of a somewhat uncertain and precarious nature.

The objection to the competency of A. E. Hoxie as a witness to give evidence of conversations with Mellor, since deceased, is clearly not well taken. A. E. Hoxie was not a party to the suit or in interest in any way whatever. Neither party claimed or derived any interest or title under or through him. The statute in respect to the competency of witnesses was intended to extend and liberalize the rules of the common law, and not to restrict them. The rule has always been that, at common law, a witness circumstanced as the one in question was competent to testify to statements or declarations made by a party since deceased. And we see no objection to this witness being asked what he heard Curtis say as to his desire to sell the lumber at Marinesco in bulk or a portion of it. Other objections to testimony admitted present no point material to the decision, and do not require consideration.

It would seem from the testimony and findings that the court below must have arrived at the conclusion that the plaintiff, under the facts and circumstances shown, was not entitled to rely, and did not in fact rely, on the statement in question, and we do not find any clear or decided preponderance of proof against this view of the case or of the finding of the circuit court. We hold, therefore, that the order vacating the attachment is correct.

*By the Court.*— The order appealed from is affirmed.