McDonald v. Markesan Canning Co. 142 Wis. 251.

McDonald, Respondent, vs. Markesan Canning Company,
Appellant.

*February 25—March 15, 1910.*

*Equity: Election between inconsistent positions: Estoppel: Waiver:
Corporations: Subscription for stock: Repudiation: Delay in
asserting right: Assignment.*

1. One who, having a choice between two inconsistent positions,
exercises that choice, is finally concluded and confined to the
rights and remedies appropriate to the position so chosen, and
excluded from those consistent only with the repudiated one.

2. The rule above stated does not necessarily rest upon grounds of
estoppel, and the election may have conclusive effect as a
waiver of rights, independent of any prejudice to other persons
which may result from a subsequent change of front.

3. Where a subscriber for stock of a proposed corporation had repu-
diated his contract and the other subscribers, acquiescing in
such repudiation, had proceeded to form the corporation and
after years of struggle had placed it upon a paying basis so
that its stock was at a premium, the subscriber first mentioned
had no right in equity to make payment and enforce issuance
of the stock for which he had subscribed.

4. Although in such case it need not be shown that the granting of
such right would result in prejudice to the other stockholders,
such prejudice might well be found from the facts stated.

5. Where a right existing only in equity is not asserted, and no in-
timation of any purpose to assert it is given, until years after
it arose, during which time there has been such a change in the
situation that enforcement of the right will work substantial
hardship, inconvenience, or embarrassment to the other party
which would not have followed its prompt assertion, the claim
founded on such right will be deemed stale and inequitable,
whether sought to be enforced by the party originally entitled
or by an assignee.

Appeal from a judgment of the circuit court for Green
Lake county: Chester A. Fowler, Circuit Judge. *Re-
versed.*

On or shortly prior to the 4th of March, 1902, the Fisk-
Kyle Company, described as canned goods brokers, a corpora-

tion of Chicago, Illinois, entered into a written agreement with the plaintiff and about thirty of his neighbors near Markesan, Wisconsin, whereby, whenever the writing should have been signed by subscribers to the extent of $11,500, the contract should become binding and should be to the effect that the Fisk-Kyle Company should procure a site at or near Markesan and should erect thereon and equip with machinery a canning factory.   Such construction was to be according to specifications and subject to approval of a committee of the subscribers, all for $11,500, "which the said second parties hereby agree to pay."   By another provision the subscribers each agreed to pay in cash twenty-five per cent. of the amount when buildings were inclosed and balance when buildings were completed, the payments to be made to the Fisk-Kyle Company.   It further provided that the contract should be closed by obtaining subscriptions amounting to $11,500 or more, whereupon the subscribers agreed to become incorporated under the laws of Wisconsin with $100 shares of capital stock, and that each subscriber thereto should receive a fully-paid nonassessable certificate of the stock to the amount of his paid-up subscription thereon.   In case the subscription exceeded $11,500, all surplus collected by Fisk-Kyle Company was to be turned into the treasury of such corporation.   The contract was subscribed to an amount slightly in excess of $11,500, to wit, $12,700.   Thereupon the subscribers met and, as a meeting of subscribers, selected a president and secretary and also a building committee, or so-called board of directors.   Plaintiff was chosen a member of said so-called board and also secretary.   The building progressed, plaintiff was dissatisfied with the work and expressed his dissatisfaction to the directors, who apparently ignored or overruled the same, whereupon he declared in the most emphatic and unambiguous terms his determination to withdraw from the whole enterprise.   A discussion continued for some time, but that determination and declaration

took place at a time after the articles of association had been signed by certain of the subscribers, including the plaintiff, and before they had been filed with the secretary of state. Thenceforward, after that declaration, plaintiff resigned as director and secretary. His resignation was not at once formally accepted on the minutes, but he, in pursuance of his declaration, withdrew entirely from all further connection. The corporation was finally organized on a stock basis of $11,500. Certain subscriptions were allowed to be withdrawn or diminished until the total of subscriptions was reduced to $11,800. All of the remaining subscribers, except one Walker, who took the same position as plaintiff did, upon completion of the building paid to Fisk-Kyle Company their subscriptions and received a receipt therefor, which, on presentation to the corporate officers, resulted in the issue of certificates of stock. Fisk-Kyle Company, in January, 1903, sued plaintiff and one Walker for the $500 which each had subscribed. In the suit against plaintiff he interposed as defense Fisk-Kyle Company's noncompliance with sec. 1770$b$, Stats. (1898), and at the close of the evidence in that case, on motion, a judgment of nonsuit was entered in June, 1903, apparently but not clearly on the ground of such invalidity of the contract. Fisk-Kyle Company waited until more than two years after this judgment and then sought permission to settle bill of exceptions, which, because the time for appeal had expired, was denied by the court. This was in 1905. They appeared thereafter to have had some correspondence with the attorney for plaintiff and said Walker in the way of an attempt to induce these subscribers to change their minds and pay their subscriptions. After all the paying subscribers had received their stock it was found to amount to $10,800, so that there remained unissued as against the two $500 subscriptions of plaintiff and Walker only seven shares of stock. This continued to remain unissued until December 27, 1907, when the president and secretary executed two

certificates of stock, one for five shares and the other for two to the defendant company itself, which, however, were never mechanically removed from the stock book where they still remain. After the building was completed the defendant engaged in the business of canning vegetables; met with misfortune, ran heavily in debt, lost money, so that its shares of stock sold as low as fifty cents on the dollar. Finally the stockholders came to its relief financially, each becoming personally liable as indorser upon its notes to the amount of seventy-five per cent. of his stockholding; and later considerable sums were supplied to the company by the loaning of credit by the creditors. In addition an increase of capital stock to the extent of $4,200 was made in February, 1904, which was mainly, if not entirely, subscribed by the existing stockholders and paid for at par. Following this increase of capital stock and a change in the character of the business the concern became profitable and in 1905 it was able to pay all its debts, including the notes which had been guaranteed by the several stockholders, and was doing a thriving business.

In 1906 plaintiff seems to have experienced a change of heart on learning that the stock had become worth a considerable premium, and an attempt was made to get the remaining seven shares issued jointly to him and Walker, although they had not at that time either of them paid their subscriptions. But on October 1, 1907, when, as appears, the stock had attained a value more than twice its par, plaintiff went to Chicago and gave his note to the Fisk-Kyle Company for $500 and surrendered his judgment for costs in the previous mentioned suit which he had found it impossible to collect, and obtained a certificate of such payment of $500. On October 10, 1907, he presented the evidence of such payment to the defendant *Markesan Canning Company* and demanded the issue of a certificate for his five shares of stock, and repeated on December 23d a further and more formal notification of the payment and demand for the certificate of stock.

Plaintiff freely conceded his categorical and intentional repudiation of the contract in 1902, his persistency in such election until 1906 or later, and that his change of position at that time was due to information that the stock had in the course of the four years become worth much more than par.

The court held substantially that plaintiff had so completely repudiated the contract and exercised his election to that end that the other parties to the contract could have stood upon such election, but that by reason of his payment to Fisk-Kyle Company, accepted by them and consequent subrogation to their right, he might enforce delivery of the stock, and entered judgment therefor, commanding the issue of a certificate to the plaintiff for five shares of stock, declared that he had no right to participate in the dividend of January, 1907, but might in all subsequent division of assets. From such judgment the defendant appeals.

For the appellant there were briefs by *Barbers & Beglinger* and *J. L. Millard,* and oral argument by *Mr. Charles Barber* and *Mr. Millard.*

*John J. Wood, Jr.,* attorney, and *B. R. Goggins,* of counsel, for the respondent.

DODGE, J. The contract here under consideration, which constitutes the basis of all rights urged, is tripartite, so that each party assumes duties to each of the others and acquires rights against each. While primarily it is a contract between Fisk-Kyle Company and the association of men, afterwards to constitute the *Markesan Canning Company,* to the effect that the former should build the factory for $11,500 and the latter accept it and issue stock to those individual subscribers upon payment by them to the former, it is also a contract between each of the subscribers and Fisk-Kyle Company to the effect that the subscriber would pay, in consideration of the construction of the building, the sum set opposite his name at a time specified. Further than this, however, it is a

contract between each subscriber and the association, when merged in the corporation, that he, the subscriber, would pay the sum specified, would participate in the incorporation, and would accept stock therein at par value for his contribution; and on the other hand that such corporation, upon such payment, would accept such individual subscriber as a stockholder and accord him his lawful rights as such. The most obvious question presented by the pleadings and evidence is whether plaintiff is entitled to the aid of a court of equity to enforce delivery to him of the stock in accordance with and by virtue of his original contract with the defendant.

The principle is very firmly established in the jurisprudence of Wisconsin that one "having a choice between two inconsistent positions, who exercises that choice, is finally concluded and confined to the rights and remedies appropriate to the position so chosen and excluded from those consistent only with the repudiated one." *Smeesters v. Schroeder,* 123 Wis. 116, 101 N. W. 363; *Pabst B. Co. v. Milwaukee,* 126 Wis. 110, 105 N. W. 563; *Smith v. Burns B. & Mfg. Co.* 132 Wis. 177, 186, 111 N. W. 1123; *Fox v. Wilkinson,* 133 Wis. 337, 113 N. W. 669; *Pfeiffer v. Marshall,* 136 Wis. 51, 59, 116 N. W. 871; *Voss v. Northwestern Nat. L. Ins. Co.* 137 Wis. 492, 118 N. W. 212. This upon the ground that by arrogating to himself the rights and advantages resulting from the first position he necessarily intends to give up and waive any inconsistent rights which would follow the alternative choice. It does not necessarily rest upon grounds of estoppel, though those may be persuasive.

In the instant case it is undisputed, indeed is established by the frank and definite testimony of the plaintiff himself, that in 1902, before the completed organization of the proposed corporation, he, on what he claimed was legal justification, fully determined upon the choice to repudiate the contract, to refuse to pay the sum subscribed by him, and to refrain from participating in the proposed corporation; that

McDonald v. Markesan Canning Co. 142 Wis. 251.

this mental determination was left in no uncertainty or doubt, but was then declared in the most unambiguous terms to his associates, who took him at his word without protest, organized their corporation without further demand upon him to co-operate, and for four or five years he and they proceeded upon the theory of the entire abandonment of any contract as between them requiring him to become a member or giving him rights as such, he retaining his money and freedom from the obligation and risks of a member. The above-cited authorities establish the final and conclusive effect of such an election and consequent waiver of any rights as a stockholder, wholly independent of any prejudice to the other party or parties to the contract which might result from a change of front, and therefore it is not material to inquire whether any such prejudice had been suffered, though in the present case it is not difficult to discover from undisputed evidence that men who have borne the burden of an unprosperous and struggling corporation through years and bolstered it with their private means and personal credit until after many years of such struggle have made it profitable and accumulated large surplus, will be prejudiced if one who has, contrary to his contract, refused to bear his share of such risk and burden is permitted to come in and assert a proportionate interest in its success. One who refuses to incur the risk cannot equitably demand a share in the success of an enterprise. Clearly plaintiff has neither legal right nor equity to now, after speculation has been transformed into certainty of profit, assert a right against the defendant that it perform the contract on its part which he so conclusively repudiated years before.

It is contended, however, that by payment to Fisk-Kyle Company, voluntarily accepted by it, plaintiff became equitable assignee of all rights of that company existing by virtue of its contract relations with the defendant, and can enforce such rights, although he may have waived all the rights which

the contract, as between him and defendant, gave him.   If
this be conceded, his rights cannot exceed those of Fisk-Kyle
Company existent at the time of such payment, October 1,
1907.   What, then, were those rights?   Clearly no legal
right to payment of either stock or money from defendant
was conferred by the contract.   That provided merely that
Fisk-Kyle Company should build the specified building for
$11,500 and should look for its pay to the individuals who
subscribed.   Nevertheless, since Fisk-Kyle Company were
to build the factory and transfer it to the *Markesan Com-
pany* in anticipation that each subscriber would pay as he
had agreed, the subsequent failure of any such subscriber
to pay created a situation where the defendant had received
something of value from Fisk-Kyle Company for which
the latter had not been paid and for which the former had
parted with nothing of value.   It is urged that in such a
situation there arose some equity that the defendant should
respond to the Fisk-Kyle Company for such benefit derived
by it to the loss of Fisk-Kyle Company.   This contention
rests upon a very broad equity, but in general it may be
conceded, *arguendo*.   It is unnecessary to decide whether
that equity could exceed payment of either the money not
received on the subscription or the shares of stock to the
same amount at the election of defendant, as we have con-
cluded that Fisk-Kyle Company had lost the right to de-
mand either, for reasons now to be stated.   When a court of
equity is invoked to grant its peculiar remedies or to enforce
rights so far variant from and in excess of any existing legal
right, the plaintiff must approach it with diligence and free-
dom from misleading and embarrassing conduct.   Especially
will he not be permitted, after long delay and change in situ-
ation, to demand such equitable right if its then enforcement
will work any substantial measure of hardship, inconvenience,
or embarrassment to the other party such as would not have
followed the prompt assertion of the right contended for.

Both diligence and clean hands are essential. *Combs v. Scott,* 76 Wis. 662, 45 N. W. 532; *Rogers v. Van Nortwick,* 87 Wis. 414, 58 N. W. 757; *Docter v. Furch,* 91 Wis. 464, 65 N. W. 161; *Cross v. Bowker,* 102 Wis. 497, 78 N. W. 564; *McCann v. Welch,* 106 Wis. 142, 81 N. W. 996; *Kruse v. Koelzer,* 124 Wis. 536, 541, 102 N. W. 1072; *Likens v. Likens,* 136 Wis. 321, 117 N. W. 799; *Larscheid v. Kittell, ante,* p. 172, 125 N. W. 442, and cases there collected; *Burkle v. Levy,* 70 Cal. 250, 11 Pac. 643; *Hammond v. Wallace,* 85 Cal. 522, 24 Pac. 837; *Plymouth v. Russell Mills,* 7 Allen, 438; *Sagadahoc L. Co. v. Ewing,* 65 Fed. 702. In the present case Fisk-Kyle Company were definitely informed prior to January, 1903, of plaintiff's refusal to pay, confirmed by a judgment, albeit only of nonsuit, in June of that year. Upon such refusal it had the duty and opportunity before it either to look to the plaintiff for payment by taking legal proceedings to enforce his contractual liability or, perhaps, yielding to his refusal, to then assert its equity against the defendant. The existence of such a claim upon the defendant's treasury either for capital stock or for money was a material consideration, especially during the two or three years of its losing business and financial embarrassment. Much of its capital stock was taken during that period, in ignorance of any such claim. We cannot say that the existence of such a cloud might not have spared the corporation and its members and officers the years of struggle, anxiety, and financial risk through which they passed, and it is no answer now to point out the fact that those labors and risks have ultimately resulted in profit. If in the years 1904 or 1905 those efforts had proved unsuccessful, the defendant and its members might well have felt outraged; especially if, as was by no means impossible, such failure had been caused in whole or in part by the assertion or discovery of the hitherto unknown demand of Fisk-Kyle Company. Obviously if its conduct had been such that in 1904 or 1905 it was de-

barred from asserting such an equity, no right to do so could thereafter be revived by the successful outcome of the defendant's business. During those years Fisk-Kyle Company gave no intimation of a purpose to assert any such demand, but allowed the defendant to organize and adjust its business under the difficulties and trials already suggested upon the basis that no such claim was to be made. In this situation, we are satisfied, under the authorities above cited, that in October, 1907, Fisk-Kyle Company could not have been recognized by a court of conscience as a suitor either diligent or clean-handed; that before that time its conduct had been such as to make any claim in its favor against the defendant stale and inequitable, and that such court must have refused it the exertion of its extraordinary jurisdiction to arouse and create the very general equity now asserted. Of course any claim by the plaintiff in the right of Fisk-Kyle Company is at least equally within the ban of this rule, and he cannot in good conscience be heard to assert it.

*By the Court.*—Judgment reversed, and cause remanded with directions to dismiss the complaint.