CAZIER, Appellant, vs. HART and others, Respondents.

*September 18—October 6, 1914.*

Sale of corporate stock: Exchange: Fraud: Rescission: Evidence:
Adequacy of price: Parties dealing "at arm's length:" False
representations and concealments not inducing sale: Laches.

1. In an action for rescission of a transaction by which plaintiff
   sold stock in a California fruit ranch to defendant, a brother
   who was managing the ranch, in exchange for stock in a Wis-
   consin woolen mill managed by another brother who acted as
   her agent in the transaction, the evidence is *held* to show that
   the stock received by her was at the time a fairly adequate
   price for the stock sold.
2. Evidence in such case of a subsequent increase in the value of
   the ranch stock and that about five years later the woolen mill
   property became worthless, was of little or no weight.
3. A finding by the court that the parties dealt "at arm's length"
   in the transaction is *held* to be supported by the evidence, from
   which it also appears that certain false representations made
   by the defendant were not relied upon by plaintiff and did not
   materially influence, much less induce, her to sell her stock.
4. Since the parties were dealing "at arm's length," silence on de-
   fendant's part as to the amount of cash and credits owned by
   the ranch company did not constitute a fraud which would
   entitle plaintiff to a rescission, especially since she was as
   much at fault in not asking defendant for a statement of the
   condition of the company as defendant was in not volunteering
   information.
5. It was plaintiff's duty, if she wished to rescind, to bring the
   action promptly after she had knowledge of the alleged fraud
   or of facts sufficient to put her on inquiry which, if pursued
   with reasonable diligence, would lead to a discovery of the
   fraud.
6. Having slept on her rights for more than three years after ac-
   quiring such knowledge, and until after the stock which she
   had been willing to take in the exchange had become worthless,
   any right of recovery which she may have had was barred by
   her gross laches.

APPEAL from a judgment of the circuit court for Racine
county: W. J. TURNER, Judge. *Affirmed.*

John S. Hart died in February, 1901. The parties to

this action are his sons and daughters. Prior to his death he owned a thirty-six-acre fruit farm which he conveyed to a corporation. The capital stock of the corporation was $33,000, represented by 330 shares of stock in a corporation known as the Hart-Blake Company. At his death Mr. Hart owned 274 shares, his wife 55 shares, and the defendant *Elmer W. Hart* 1 share. Subsequently the children acquired the stock of the widow on the basis of a valuation of $18,000 on the property of the corporation, and became substantially equal owners of the entire capital stock.. Prior to the father's death, *Elmer W. Hart* and the plaintiff, *Mrs. Cazier,* resided in Chicago, *Sands M. Hart* in Racine, and *Mrs. Crandall* in Minneapolis. *Sands M.* and *Elmer W. Hart* and *Mrs. Cazier* were elected directors of the corporation after the stock was acquired. *Sands M.* was elected president and *Elmer W.* manager. From the time of his father's death until November, 1905, *Elmer* continued to act as manager and was the only stockholder who resided in California. In 1905 negotiations were started which resulted in *Elmer* acquiring the entire stock in the corporation for an agreed consideration of $21,000, to be paid in stock of another corporation on the basis of such stock being worth double its face value. This stock was in a woolen mill company located in Racine and managed by *Sands M. Hart.* All of the parties to this action were the owners of woolen mill company stock acquired through their father.

This suit was commenced in 1910 and was brought by the plaintiff to rescind the sale of her stock to the defendant *Elmer* on the ground that the sale was induced by fraudulent representations and fraudulent concealments. *Mrs. Crandall* and *Sands M. Hart* refused to join as parties plaintiff and were therefore made defendants. The trial resulted in a judgment for the defendant *Elmer,* and plaintiff appeals. The findings, covering as they do twenty-six pages of the case, are so lengthy that a synopsis of them is omitted. Those ma-

terial to a disposition of the questions presented on the appeal will be referred to in the opinion.

For the appellant there was a brief by *Martin J. Gillen,* attorney, and *John B. Simmons,* of counsel, and oral argument by *Mr. Simmons* and *Mr. M. H. Cazier.*

For the respondent *Elmer W. Hart* there was a brief by *Thompson, Myers & Kearney,* attorneys, and *Thomas M. Kearney,* of counsel, and oral argument by *Mr. Kearney* and *Mr. W. D. Thompson.*

BARNES, J.    The appellant urges that the trial court erred (1) in finding that no confidential relation existed between the defendant *Elmer* and the other stockholders of the corporation in relation to the sale and transfer of the stock; (2) in failing to find that said defendant procured such sale and transfer to himself by fraudulent concealment and misrepresentations, so that he should be held to account as a trustee *de son tort;* (3) in finding that after July 1, 1905, the parties dealt at arm's length and that the fraudulent representations and concealments found did not vitiate the sale; (4) in finding that the plaintiff ratified the sale; (5) in finding that the plaintiff was guilty of gross laches in bringing her action; and (6) in concluding that plaintiff was not entitled to judgment.

Mr. Cazier, the plaintiff's husband, visited the ranch in 1903, and again in April, 1905, when he looked it over thoroughly, although he made no examination of the books.    His wife was with him on the latter occasion, but paid no particular attention to the ranch.    They stopped in Minneapolis on their way home and called on *Mrs. Crandall.*    Mr. Cazier advised her that the ranch was looking fine, but that it was not likely to pay a dividend so long as its present manager was in charge and that the present was the opportune time to sell, owing to the fact that there was a good crop.    He further thought that some pressure should be brought to bear

on *Elmer* to make him buy. The sisters consented and Mr. Cazier then took the matter up with *Sands M. Hart,* who finally agreed to act in concert with his sisters. Accordingly *Sands,* on June 28, 1905, wrote *Elmer* suggesting that he buy the stock not owned by him, and stated that if *Elmer* was not willing to do so he (*Sands*) and his sisters would sell their stock to a third party. The court found that after the writing of this letter the parties dealt at "arm's length" in reference to the purchase of the stock. *Elmer* protested against any sale being made which did not include his stock also, and stated that his position would be undesirable if he were a minority stockholder in a corporation controlled by strangers. Negotiations continued for some time. *Sands* in behalf of himself and his sisters offered to sell on a basis of the corporate property being worth $25,000 and to take in payment woolen mill stock on the basis of its being worth double its face value. *Elmer* was willing to buy at the price named, provided they would take his woolen mill stock in payment at 260. This they declined to do. He then made a counter offer of $21,000, the woolen mill stock to be taken in payment at the price fixed by *Sands,* which was finally accepted.

The court found that *Elmer* had always made correct entries on the books kept by him of all moneys received and disbursed. Also that prior to May, 1905, he had never been guilty of any fraudulent representations or concealments.

During the years 1901 to 1904 inclusive the Hart-Blake Company paid no dividends. Whatever gains there were, were put back in improvements, and it would not be far from the truth to say that during that period the ranch did little better than hold its own. Balance sheets were sent to the stockholders for each of those years. Shortly after the death of John S. Hart the ranch was placed on the market for sale at $33,000. Later the price was reduced to $25,000, and the agents with whom the property was listed were advised that

a lower offer would be considered. *Elmer, Sands,* and plaintiff's husband apparently attempted to make a sale. No offer seems to have been made by any one. At least none was shown. The interest of the widow was purchased in 1902 on the basis of the property being worth $18,000. The court found that there was no fixed market value for this species of property and that its value was of a speculative character depending on numerous considerations. It also found that the ranch, exclusive of cash and credits of the corporation, aggregating some $4,000, was worth about $21,000 in November, 1905, when *Elmer* bought it. It was the plaintiff's own offer to accept woolen mill stock on the basis finally agreed upon in payment for her ranch stock, and she certainly knew as much about the value of what she was getting as did *Elmer,* and her brother *Sands,* who acted as her agent in the transaction, knew a great deal more, because he was the manager of the woolen mill company. The fact that the company went on the rocks some five years later in no way affects the present case. The evidence tended to show that the book value of this stock in 1905 was about three times its face value, and the court found that the stock was worth "at least the sum of $200 per share as shown by the books" of the company. *Elmer* first insisted that the stock should be taken at 300 and later at 260. If allowed either of these figures, he was willing to buy the ranch and property of the corporation owning it at the price asked therefor, $25,000. Looking at the situation as it was in 1905, it would be difficult to reach the conclusion that *Elmer* stole the ranch or that he did not pay a fairly adequate price for it. The fact that crops were good and prices were high after the ranch was sold to *Elmer,* so that he was able to sell the property for $45,000 in 1907, has little more bearing on the case than if crops had been bad and prices low and the ranch had been sold for $10,000.

The first misrepresentation or false statement made by

*Elmer* as found by the court was contained in a letter written about July 15, 1905. In reference to this letter, the court found that it was falsely stated therein that it would require a large investment to keep the ranch up to its "present state of productiveness." The court also found that in a letter written November 15th *Elmer* falsely stated that the state of California had imposed a tax of either one dollar per thousand or ten dollars per thousand on the capital stock of foreign corporations doing business in that state, and furthermore falsely stated that he had been elected president of one fruit association at a salary of $300 per year, and a director of another which paid him $10 per meeting for attending at its monthly meetings.

The court also found that *Elmer* intentionally concealed from the plaintiff and his codefendants the fact that there was upwards of $4,000 in money and credits in his possession as manager of the ranch at the time the sale was made; that none of the other stockholders knew of said fact; that if plaintiff were advised of such a condition she would have demanded her proportion of the credit and required *Elmer* to account to her therefor.

The appellant strenuously contends that the court was wrong in holding that the parties dealt at arm's length after June 28, 1905, and that on the findings of misrepresentation and concealment made the plaintiff was entitled to judgment. The appellant also urges that the court erred in making certain other findings favorable to the defendant *Elmer* and in refusing to find additional facts in favor of the plaintiff.

For several reasons relief was properly denied on account of the false statements contained in *Elmer's* letters.

The court found that after April, 1905, plaintiff's husband was acting for her and advising her and that she was accepting his advice and acting under his direction in making the investigation of the value and prospects of the ranch and in directing the proceedings which culminated in the sale; that

Mr. Cazier had trouble with *Elmer* in 1902, and that thereafter he did not place implicit confidence in *Elmer's* honesty and truthfulness; that Cazier visited the ranch in 1903 and again in 1905, when he looked it over thoroughly; that in September, 1905, while negotiations were pending, he sent one Oliver, an expert orchardist (who, by the way, was married to Cazier's sister), to make a thorough examination of the ranch and of *Elmer's* books and to make a report on the value of the property, and that Oliver reported it would not be a paying investment at $25,000 and would not pay an income on that sum. These findings are all sustained by the evidence. Cazier, writing to *Mrs. Crandall* in January, 1909, stated that he knew *Elmer* was "loading the dice." He testified that by such expression he meant and believed that *Elmer* was taking advantage of the other parties. "That had reference to the time of that transaction in 1905." In the face of these facts, this court cannot disturb the conclusion of the trial court that the plaintiff and *Elmer* dealt at "arm's length" in the transaction pertaining to the sale of this stock.

Furthermore, it seems very clear to this court from an examination of the whole testimony that the false statements referred to were not relied on by the plaintiff and did not influence her in the slightest degree in selling her stock. Cazier knew from personal observation in April, 1905, that the prospects for a good year were very promising. For this reason he told *Sands M. Hart* that they should make a desperate effort to sell, presumably because he had no confidence in *Elmer*. When the negotiations were assuming a definite shape he sent his own expert to make a critical examination of the physical conditions at the ranch and of the books of account kept by *Elmer,* and the report of this expert was shown to *Sands,* who was acting for *Mrs. Crandall* and to some extent for the plaintiff. This examination was made after *Elmer's* letter of July 15th had been received. There was very little in the later letter that was calculated to influence

any one to any appreciable extent, and it is reasonably certain from the whole record that the plaintiff had concluded to sell before she saw this second letter.

The claim that *Elmer* was guilty of fraudulent concealment because he did not volunteer any information as to the amount of cash and credits on hand requires separate treatment. The amount of such cash and credits would seem to be larger than the evidence would warrant, if the court meant a net sum after the indebtedness of the corporation was paid. The error, if there is one, is not material, however. It has already been said that the finding of the court to the effect that plaintiff and *Elmer* were dealing at "arm's length" in this transaction was sustained by the evidence. This being so, *Elmer's* silence did not constitute a fraud that would entitle the plaintiff to a rescission. 2 Pom. Eq. Jur. (3d ed.) §§ 901, 903; *Ætna L. Ins. Co. v. Mabbett,* 18 Wis. 667, 671; *Garbutt v. Bank of Prairie du Chien,* 22 Wis. 384, 392; *Curtis Bros. & Co. v. Hoxie,* 88 Wis. 41, 59 N. W. 581; *Thormaehlen v. Kaeppel,* 86 Wis. 378, 56 N. W. 1089.

If the law were otherwise there could be no recovery. Assuming that there was a legal or moral duty on *Elmer's* part to make a full disclosure, the plaintiff knew that he had not done so. She knew as early as April, 1905, that the prospects of making money that year were better than they had ever been. In two of *Elmer's* letters, written while the negotiations for the sale of the stock were going on, he stated in substance that they were having the best year they had had. When Oliver made his examination in September the crop had been largely harvested and the prevailing prices were known. The plaintiff or her agents and representatives in making the sale of her stock were fully advised that they were having a banner year and that the effect of it would increase the value of their stock. They did not know just what the amount of the profits would be, but they had every reason to believe that they would be substantial. If equity lends its

aid only to the diligent, it would seem reasonably clear that plaintiff was as much at fault in not asking *Elmer* for a statement of the condition of the company before the transaction was consummated as *Elmer* was in not volunteering the information. That there would be profits for the year 1905 was a fact within the knowledge of plaintiff. As to this there was no concealment. It is difficult to explain her failure to ascertain the amount unless she was determined to sell regardless of 1905 profits.

The court further found that as early as February, 1907, the plaintiff and her husband were informed of many facts tending to show fraud on the part of *Elmer,* and that such facts were sufficient to put them upon inquiry as to the good faith of *Elmer* in the transaction; that this action was not commenced until August, 1910, when the woolen mill stock became worthless; that plaintiff continued to treat the stock received from *Elmer* as her own after knowledge of the facts constituting the alleged fraud; that the parties could not now be placed *in statu quo,* and that the delay of the plaintiff in bringing her action was unconscionable, and any right of recovery she might have had was barred by her gross laches. These findings of the lower court and the conclusion drawn therefrom cannot be disturbed by this court. It was the duty of the plaintiff to bring her action promptly after she had knowledge of the alleged fraud or of facts sufficient to put her on inquiry and which if pursued with reasonable diligence would lead to a discovery of the fraud. *McDonald v. Markesan C. Co.* 142 Wis. 251, 258, 125 N. W. 444, and cases cited; *Holden v. Meadows;* 31 Wis. 284; *Docter v. Furch,* 91 Wis. 464, 65 N. W. 161.

We have no desire to condone or to palliate the conduct of *Elmer* in misstating or concealing facts and conditions. It is apparent, however, that his misrepresentations did not materially influence, much less induce, the plaintiff to sell her stock to him, and that the plaintiff has slept so long on her

rights, if she had any, that it would be inequitable to grant her relief after the stock which she was willing to take in exchange for her ranch stock had become worthless.

*By the Court.*—Judgment affirmed.